Richard **ADDRISI**, on behalf of himself and all others similarly situated, Plaintiff-Appellant, .

v.

The **EQUITABLE LIFE ASSURANCE SO-CIETY OF the UNITED STATES**, a New York corporation, Defendant-Appellee.

No. 72–2607.

United States Court of Appeals, Ninth Circuit.

Sept. 30, 1974.

726

George D. Donnahoe, Hollywood, Cal., for plaintiff-appellant.

Frank R. Johnston (argued), George W. Tackabury, of Newlin, Tackabury & Johnston, Los Angeles, Cal., for defendant-appellee.

Before ELY and CARTER, Circuit Judges, and EAST,* Senior District Judge.

## OPINION

EAST, Senior District Judge:

The plaintiff-appellant Richard Addrisi (Addrisi), on behalf of himself and all others similarly situated, appeals from the District Court's order dismissing with prejudice his first amended class action complaint on the ground and for the reason that the pleading "fails to state a claim upon which relief can be granted, and that the [District] court lacks jurisdiction over the subject matter." We affirm.

Sufficient for the purposes of this appeal is the following narrative of the allegations contained in the pleading:

Addrisi sought a treble damage award from the defendant-appellee The Equitable Life Assurance Society of the United States (Equitable) for alleged violations of Title 15 U.S.C. §§ 14 and 15, commonly known as the Clayton Act, and § 2 of Title 15, commonly known as the Sherman Act, (antitrust laws of the United States) arising out of Equitable's requirements and practices in its insurance-lender enterprises.

Equitable is a corporation incorporated under the laws of the State of New York and authorized to engage in the business of issuing life and other kindred forms of insurance in the State of California, and has at all pertinent times pursued the practice of making so called Assured Home Owner Loans, secured by deeds of trust, to individuals for the purpose of financing the purchase of residential real property sites, specifically offering its Home Owner Loans to prospective policyholders at a lower interest rate than the general prevailing interest rates offered by other institutional lenders in the immediate area. In these instances, Equitable's insurance agent also acts as the loan agent, and as a condition to and a "tie-in" practice with ultimately making these loans, Equitable requires as additional security that the prospective borrower and policyholder purchase through its joint loan broker and insurance agent a type of a "cash value" life insurance policy known as the "Adjustable Whole Life" policy. This policy has a high cost to the policyholder and returns high commissions to the joint loan broker and insurance agent. The tie-in requirement of the purchase of such a policy from Equitable with the making of the loan is accomplished through the vast economic power of Equitable exerted through the joint loan broker and insurance agent. The agent with human inclinations to either press for or lag with disparaging expressions or statements on the loan application exerts economic coercion upon the prospective borrower to purchase the Equitable policy.

Addrisi applied for an Equitable loan, was subjected to that type of economic coercion, purchased the Equitable policy and secured the loan, all at a greater expense and cash outlay to him of some $864 over the cost of the usual and customary type of term life policy.

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

It is important to here note that Addrisi's allegations and complaints against Equitable are in sum and substance identical to the allegations contained in the proposed second amended complaint dealt with by the California District Court of Appeal for the Second District in Greenberg v. The Equitable Life Assur. Society of the United States, 34 Cal.App.3d 994, 110 Cal.Rptr. 470 (1973).[1]

## ISSUES

We are satisfied that the main meritorious contentions of the parties in this appeal narrow down to presenting three simple issues for our consideration, namely:

(1) Was Equitable engaged in the business of insurance at the time of its alleged conduct?

(2) If so, was its business of insurance regulated by the State of California within the meaning of Title 15 U.S.C. § 1012, commonly known as the McCarran-Ferguson Act?

(3) Or was Equitable's alleged acts of economic coercion an "act of . . . coercion," within the thrust of § 1013(b) of Title 15 U.S.C. and thus subject to the proscriptions of the Sherman Act?

## DISCUSSION

Issue 1:

Our answer to issue 1 is readily in the affirmative. Addrisi's allegations establish that Equitable is qualified and does actively engage in the business of life insurance within the State of California as well as all other sister states. While Equitable does also engage in the real estate loan business in California as an adjunct to its business of insurance, Addrisi complains only of the tactics and practices of Equitable in connection with its business of insurance as being proscribed by the antitrust laws of the United States. It is difficult for us to envision a local real estate mortgage loan which together with real estate loan brokers,[2] is fully regulated by local state law as being in commerce.

Issue 2.

During the period between the years 1870 and 1944, the Congress and the United States courts adhered to the concept that the business of "[i]ssuing a policy of insurance is not a transaction of commerce." Paul v. Virginia, 75 U.S. (8 Wall) 168, 183, 19 L.Ed. 357. Consequently regulation and policing of the business of insurance was thought to rest exclusively with the states. Then came the decision in United States v. South-Eastern Underwriters Ass'n., 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), holding "that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws in particular, were applicable to them."

> Congress clearly [became] concerned about the inroads [that] decision might make on the tradition of state regulation of insurance. *The McCarran-Ferguson Act was the product of this concern. Its purpose was stated quite clearly in its first section;* Congress declared that "the continued regulation and taxation by the several states of the business of insurance is in the public interest." . . . 15 U.S.C. § 1011. As this Court said shortly afterward, "[o]bviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 429, 66 S.Ct. 1142, 90 L.Ed. 1342, . . . (1946). (Emphasis

---

1. We are advised that Equitable chose not to petition the Supreme Court of California for a Hearing.

2. In this connection, see Article 5.5, Insurance Code of the State of California, §§ 770–776, entitled "Insurance in Connection with Sales and Loans." This section was not dealt with in the companion state case of *Greenberg*.

supplied). S. E. C. v. National Securities, 393 U.S. 453, 89 S.Ct. 564, 21 L. Ed.2d 668 (1969).

In furtherance of that purpose, § 1012 of Title 15, in its pertinent parts, provides:

(a) The business of insurance, and every person engaged therein, *shall be subject to the laws of the several States* which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed *to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance,* or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act . . . known as *the Sherman Act,* and the Act . . . known as *the Clayton Act,* . . . *shall be applicable to the business of insurance to the extent that such business is not regulated by State law.* (Emphasis supplied).

■ *National Securities, supra,* at page 460, 89 S.Ct. at page 569, teaches that the relationship between an insurer and its insured, the type of policy which can be issued, its liability, interpretation and enforcement constitute the core of the business of insurance, and that it is clear that the focus of the McCarran-Ferguson Act was on the *relationship between an insurance company and its policyholder.* "Statutes aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the 'business of insurance.' "

■ Generally speaking, the State of California has enacted laws extensively "regulating the business of insurance," which have been in effect at all pertinent times, and particularly Article 6.5, Insurance Code of the State of California, §§ 790–790.10, inclusive, entitled

"Unfair Practices." Accordingly we hold that the State of California regulates Equitable's business of insurance (the relationship between it and its insureds and the issuance of life policies) within the meaning of § 1012(a) and (b); and further, whether the California laws proscribe or permit the alleged acts of economic coercion in the issuance of life insurance policies is of no concern to the full force and effect of § 1012(a), and (b). California League of Independent Insurance Producers v. Aetna Casualty & Surety Company, 175 F.Supp. 857 (N.D.Cal.1959) and Ohio AFL–CIO v. Insurance Rating Board, 451 F.2d 1178 (CA6 1971).

Nor are those alternates to our judicial concern, except to note that apparently Addrisi's alleged acts of economic coercion on the part of Equitable are viable claims under California law. *Greenberg, supra.*

Issue 3:

Addrisi contends that the alleged acts of economic coercion on the part of Equitable remain subject to and are proscribed by the Sherman Act[3] under the provisions of § 1013(b), Title 15, providing:

(b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to *any agreement to boycott, coerce,* . . . *or act of boycott, coercion,* . . . . (Emphasis supplied).

■ Similar contentions as to alleged acts of boycott as used in § 1013(b) were heard and rejected in Meicler v. Aetna Casualty and Surety Company, 372 F.Supp. 509 (S.D.Tex.1974); and Transnational Insurance Company v. Rosenlund, 261 F.Supp. 12 (D.Ore.1966). We agree with the rationale expressed in each of those cases in that it is evident from an examination of the legislative history behind § 1013(b) that the intent of Congress was to reserve unto

---

**3.** We assume, without expressing any opinion, that Addrisi's allegations state a viable claim for relief in the antitrust sense under the Sherman Act.

the reach of the Sherman Act only a narrow area of restraint of trade activity among those in the business of insurance, namely, antitrust acts among insurance companies and agents for the purpose of boycott or coercion among insurance companies and agents. *Transnational* states: "[t]he legislative history [behind the McCarran-Ferguson Act] shows that the boycott, coercion . . . exception, was placed in the legislation to protect insurance agents from the issuance by insurance companies of a 'black-list,' which would name companies or agents which were beyond the *pale*. This list, in effect, was a directive to an agent not to write insurance in the name of or for the blacklisted company; otherwise, he would be stripped of his agency and not permitted to write insurance for any of the members of the governing organization of insurance companies." "1. 91 Congressional Record, p. 1087 (79th Congress, 1st Session)." As so succinctly stated in *Meicler*, 372 F.Supp. at page 514, so it is here:

> Neither party has cited nor can this Court locate any decision applying § 1013(b) in the context of an alleged combination of insurance companies to boycott, coerce, or intimidate *policyholders at large*. (Emphasis supplied).

 We believe to hold otherwise would vitiate the McCarran-Ferguson Act in its concept of setting over unto the several states the regulation and protection of the insurer-insured relationship. National Securities, *supra*, 393 U.S. at page 460, 89 S.Ct. 564, and *Transnational*, *supra*, 261 F.Supp. at page 28.

Whatever meaning or interpretation the California court in *Greenberg*, *supra*, may have addressed to the words "acts of coercion" as used in § 790.03(c)

of the California Insurance Code[4] can be of no concern here. That California court was in no way dealing with or attempting to interpret or construe the like language as used in § 1013(b). In this appeal, we are not concerned with the meaning or the language of the words "acts of coercion" as used in § 1013(b) per se, but only of what class of persons or business relationship is protected from "acts of coercion" under the Sherman Act through the reserving thrust of § 1013(b). As pointed out above, neither Greenberg[5] or Addrisi enjoy that protection.

Finally, we conclude that the District Court was correct in dismissing the first amended class action complaint with prejudice on the ground and for the reason that the pleading fails to state a claim upon which relief can be granted under the antitrust laws of the United States.

Affirmed.

---

4. " 'Coercion' prohibited by [§ 790.03(c)] is thus coercion in the antitrust sense, conduct which constitutes the improper use of economic power to compel another to submit to the wishes of one who wields it. (Atlantic Refining Co. v. Federal Trade Commission, 381 U.S. 357, 368–369, 85 S.Ct. 1498, 14 L.

Ed.2d 443, . . . Simpson v. Union Oil Co. of Calif., 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98)" 110 Cal.Rptr. at page 474.

5. It is manifest that *Greenberg* inferentially held § 1013(b) had no application to the "acts of coercion" alleged, else the state court lacked jurisdiction.