Joseph A. ZELSON, Appellant,

v.

PHOENIX MUTUAL LIFE INSURANCE COMPANY and Phoenix Equity Planning Corporation, Appellees.

No. 76–1197.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 11, 1976.

Decided Feb. 4, 1977.

H. Kent Munson, St. Louis, Mo., for appellant; Hyman G. Stein and Charles Alan Seigel, St. Louis, Mo., on the brief.

Kenneth F. Teasdale, St. Louis, Mo., for appellee; Edwin L. Noel, St. Louis, Mo., on the brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, and HEANEY and HENLEY, Circuit Judges.

VAN OOSTERHOUT, Senior Circuit Judge.

This case raises substantial questions concerning the exemption from the federal antitrust laws provided to the business of insurance by the McCarran-Ferguson Act, as amended, 15 U.S.C. §§ 1011–1015. The district court, for reasons stated in its memorandum opinion, 410 F.Supp. 1343 (E.D.Mo. 1976), granted defendants' motion to dismiss plaintiff's complaint with prejudice for failure to state a claim upon which relief could be granted. We reverse.[1]

The factual allegations of the complaint, which for purposes of reviewing the propriety of the dismissal we assume to be true, are relatively simple. Plaintiff Joseph A. Zelson is a Missouri resident engaged in the business of selling and servicing both insurance coverages and securities. From about March 1953 through August 1974 plaintiff was by contract an agent of defendant Phoenix Mutual Life Insurance Company (Phoenix), a Connecticut corporation, and established "a very successful and profitable business" selling Phoenix policies.

Sometime subsequent to March 1953 plaintiff "found it necessary and desirable to make available to his clients various securities and variable annuities." To this end plaintiff became a licensed, registered securities representative with the National Association of Securities Dealers and a registered representative of North American Securities Corporation, a securities broker-dealer. Plaintiff thereafter established a "profitable and advantageous business" providing for his clientele various securities "in conjunction with" his sale of Phoenix insurance.

After plaintiff had been so dealing in securities for some time, defendant Phoenix Equity Planning Corporation (Pepco)[2] was incorporated under the laws of Connecticut and commenced operations as a broker-dealer of various types of securities, in direct competition with plaintiff and North American Securities Corporation. Defendants

---

1. This case was submitted to us on the same date as *Seasongood v. K & K Insurance Agency*, 548 F.2d 729 (8th Cir. filed Jan. 6, 1977), which likewise arose on a motion to dismiss and which likewise concerned generally the McCarran-Ferguson exemption from the antitrust laws. With these initial observations, however, the similarity between the two cases is essentially exhausted.

2. Pepco is apparently a wholly-owned subsidiary of Phoenix.

Phoenix and Pepco subsequently agreed, combined or conspired in an effort to require that plaintiff, in order to continue selling and servicing Phoenix insurance policies, sell and service securities only through Pepco. Specifically, plaintiff was informed that his insurance agency contract with Phoenix would be canceled unless he agreed to withdraw as a representative of North American Securities Corporation and to become a registered representative of Pepco.

Initially, plaintiff acceded to the demands of Phoenix and Pepco. Ultimately, however, he found Pepco unsatisfactory in providing securities for his clientele and withdrew as a registered representative of Pepco. Thereupon, Phoenix notified plaintiff that, as of September 1, 1974, his insurance agency contract with Phoenix was terminated.

Plaintiff claims that this alleged combination or conspiracy is in violation of Sections 1 and 2 of the Sherman Act, as amended, 15 U.S.C. §§ 1 and 2, respectively, and Section 3 of the Clayton Act, 15 U.S.C. § 14.[3] He seeks damages in the trebled amount of $1,241,793.00,[4] together with attorneys' fees and costs, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

Defendants contend that their actions are shielded from federal antitrust scrutiny by the McCarran-Ferguson Act. The controlling provisions of this Act are Sections 2(b) and 3(b), as amended, 15 U.S.C. §§ 1012(b) and 1013(b), respectively, which provide as follows:

Section 2(b). No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

Section 3(b). Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

The district court held that Section 2(b) did apply and that Section 3(b) did not. It accordingly dismissed plaintiff's complaint with prejudice.

In an effort to escape the result reached by the district court, plaintiff advances two contentions. These are: (1) the activities complained of are not the "business of insurance" within the meaning of Section 2(b); and (2) the activities complained of constitute "act[s] of boycott, coercion, or intimidation" within the meaning of Section 3(b).

We hold that the complaint does not conclusively demonstrate that the activities complained of are the business of insurance within the meaning of Section 2(b) and that it was for this reason improperly dismissed. We do not reach the second contention raised by plaintiff.[5]

---

**3.** Plaintiff also claims that the alleged combination or conspiracy is in violation of Section 3 of the Sherman Act, as amended, 15 U.S.C. § 3. The relevance of this provision is not apparent to us.

**4.** According to the complaint, the $1,241,793.00 figure represents treble the alleged amount of past and future profits plaintiff would have realized with respect to the sale of Phoenix insurance had the combination or conspiracy not been carried out.

**5.** In *Seasongood v. K & K Insurance Agency, supra* note 1, 548 F.2d at 733, in a lengthy quote from *Great Atlantic & Pacific Tea Company v. Amalgamated Meat Cutters,* 410 F.2d 650, 652–53 (8th Cir. 1969), we set forth familiar principles governing the manner in which the Federal Rules of Civil Procedure treat motions to dismiss. We also provided, at 733–34, a brief review of the history of the McCarran-Ferguson Act. Neither matter requires repetition here.

## I.

Section 2(b) of the McCarran-Ferguson Act provides that the antitrust laws shall be applicable to "the business of insurance" to the extent that such business is not regulated by state law. Defendants strenuously argue that the activities alleged in the complaint are the business of insurance. Plaintiff, just as strenuously, argues they are not. The question is a close one.

In *Securities & Exchange Commission v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Supreme Court considered the scope of "the business of insurance" under the McCarran-Ferguson Act in the context of an alleged violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The Securities and Exchange Commission brought suit contending that communications sent to stockholders in connection with a proposed merger of two insurance companies contained false or misleading statements. The lower courts held that the action was barred by the McCarran-Ferguson Act. The Supreme Court, reversing, articulated the standards which control our disposition here:

> The statute did not purport to make the States supreme in regulating all the activities of insurance *companies*; its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply. Certainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* [*United States v. South-Eastern Underwriters Assn.,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440] was all about. The selling and advertising of policies, *FTC v. National Casualty Co.,* 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), and the licensing of companies and their agents, cf. *Robertson v. California,* 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946), are also within the scope of the statute. Con-

> gress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia* [8 Wall. 168, 19 L.Ed. 357] held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

393 U.S. at 459–60, 89 S.Ct. at 568–69. Although these standards were originally delineated in a securities context, the courts of appeals have uniformly held them applicable in an antitrust context as well. *Dexter v. Equitable Life Assur. Soc'y,* 527 F.2d 233 (2d Cir. 1975); *Addrisi v. Equitable Life Assur. Soc'y,* 503 F.2d 725 (9th Cir. 1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975); *Battle v. Liberty Nat'l Life Ins. Co.,* 493 F.2d 39 (5th Cir. 1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *Travelers Ins. Co. v. Blue Cross,* 481 F.2d 80 (3d Cir. 1973), cert. denied, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); *Commander Leasing Co. v. Transamerica Title Ins. Co.,* 477 F.2d 77 (10th Cir. 1973).

The complaint before us charges in essence that defendants Phoenix and Pepco combined and conspired in an effort to require plaintiff, in order to remain an insurance agent of Phoenix, to sell securities only through Pepco. We agree with the district court that the issue before us "is not whether the brokering of securities and variable annuities by an insurance company is the 'business of insurance', although it has been held that neither [is]." 410 F.Supp. at 1346. The fact that plaintiff acts as an insurance agent as well as a

securities broker and the fact that the activities alleged in the complaint involve in some measure the supervision or control of an insurance agent by its principal cannot offhandedly be disregarded in assessing whether those activities constitute a part of the insurance business. At the same time, however, as plaintiff accurately points out, the alleged conduct "impinges upon the competition within the securities industry, not upon the competitive forces within the insurance industry." And, *prima facie* at least, the effect of an insurance agent's securities dealings on the core relationship between insurer and insured is not an obvious one.

■ In short, both plaintiff and defendants present cogent reasons why this court should adopt their respective positions. We venture to express our view, and our holding, only upon a critical analysis of the cases decided under *National Securities*. We conclude that none of these cases support the district court's decision. Although defendants may ultimately prevail, the bare allegations of the complaint do not warrant the granting of defendants' motion to dismiss.[6]

## II.

Defendants contend that several lines of cases compel an affirmance. We discuss these in turn.

### A. *Dexter* and *Addrisi.*

In *Dexter v. Equitable Life Assurance Society* and *Addrisi v. Equitable Life Assurance Society*, both *supra*, individuals seeking to procure home loans challenged Equitable's practice of requiring the purchase of insurance as a condition or "tie" to obtaining the loans. The Second and Ninth Circuits, respectively, held, *inter alia,* that the practice complained of was the business of insurance and that the complaints had been properly dismissed.

We agree with the results reached in *Dexter* and *Addrisi* and in particular with the rationale succinctly set forth by *Dexter*:

> Forcing people to buy insurance may well be an undesirable practice—and we do

---

**6.** Defendants advance two preliminary arguments directed to particular portions of the complaint. We agree with neither.

Defendants initially point out that, as alleged in the complaint, plaintiff sells securities "in conjunction with" his sale of insurance. Therefore, it is argued, the two lines of business are part and parcel of the same business, *i. e.,* the insurance business. Plaintiff takes a starkly contrasting position in his brief, alleging, for instance, that not all of the individuals purchasing securities from him are interested "in the slightest" in purchasing insurance. We cannot resolve this dispute solely on the pleading. In our view the words "in conjunction with" as used in the complaint are equivocal and uncertain, not definite, and cannot be construed as a semantic concession by plaintiff that his securities business was a part of his insurance business. Even if they were so construed, we would not for that reason alone foreclose plaintiff from presenting his case on the merits. The Supreme Court has cautioned: .

> The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.

*Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

Defendants also stress that plaintiff's prayer for relief only alleges damages in the nature of reduced insurance commissions. See note 4, *supra.* Although this observation is correct, we are not persuaded that it compels an affirmance here. Under the McCarran-Ferguson Act, the pertinent inquiry is whether the activities complained of are part of the business of insurance, not whether the relief sought involves that business. A somewhat similar situation arose in *National Securities* itself. After concluding that the activities there at issue were not the business of insurance, the Supreme Court addressed whether, as a matter of remedies, the Securities and Exchange Commission could seek to unwind the merger between the two insurance companies. The Court held it could, notwithstanding the fact that the merger had been approved by the Arizona Director of Insurance. The Court emphasized that "the gravamen of the complaint was the misrepresentation, not the merger" and that "any 'impairment' [of Arizona's insurance laws] . . . is a most indirect one." 393 U.S. at 462, 463, 89 S.Ct. at 570. On a similar reasoning, the gravamen of the complaint here is a restriction on securities dealings, not a deprivation of insurance business, and it is not argued that an award of damages as prayed for would impair Missouri's insurance laws.

not suggest that we approve of it—but it is part of "the business of insurance." . . . An insurance company's methods of inducing people to become policyholders pertain to the company-policyholder relationship, and thus constitute an integral part of "the business of insurance."

527 F.2d at 235 (footnote omitted).

We do not agree, however, that *Dexter* and *Addrisi* afford a basis for dismissing the complaint before us. Forcing prospective policyholders to buy insurance cannot be equated with forcing agents to deal in securities in a particular manner. We may assume, although we need not decide, that the rationale of *Dexter* and *Addrisi* would encompass an insurance company's forcing an agent to deal in insurance in a particular manner—even if the insurance dealings were in some way tied to a non-insurance product or service. But a more fundamental distinction between *Dexter* and *Addrisi*, on the one hand, and the instant case, on the other, besets defendants' contention that those cases control this one. In *Dexter* and *Addrisi* individuals allegedly were forced to buy insurance in order to obtain loans. In conventional terms insurance was the "tied" item, and it was indeed insurance which the individuals were forced to buy. Here, however, plaintiff was allegedly forced to deal in securities in a particular manner in order to continue as a Phoenix insurance agent. Plaintiff's insurance agency was the "tying" item, not the tied item, and plaintiff was forced to deal in securities in the manner specified. He was not forced to do anything with respect to insurance. Thus, the alleged tying arrangement presently before us is essentially the reverse of the alleged tying arrangement in *Dexter* and *Addrisi*.

It is apparent that *Dexter* and *Addrisi* do not support a conclusion that using insurance as a coercive lever or tying device in order to compel certain dealings in a non-in-

surance product or service is the business of insurance. And, precisely because such activities impinge upon competitive forces in the non-insurance market, they are less readily characterizable as insurance activities than are arrangements of the *Dexter-Addrisi* type. We turn then, to a consideration of those cases which have involved arrangements of the type involved here.

### B. *Other Tying Decisions.*

The courts have considered a number of McCarran-Ferguson Act cases in which insurance allegedly was used as a tying device, or in some manner similar to a tying device, to compel or encourage particular dealings in other products or services. The results in these cases have varied, thus indicating that such practices are not *per se* a part of the insurance business. Moreover, the individual rationales espoused in those cases holding such practices within the insurance business are not applicable here.

In *Battle v. Liberty National Life Insurance Company, supra,* a supplier of funeral merchandise and services (Brown-Service) allegedly conspired with a burial insurance company (Liberty National) in an effort to induce Liberty National's policyholders to utilize the merchandise and services of Brown-Service. In reversing a dismissal of the complaint, the Fifth Circuit held, *inter alia,* that the activity complained of was not, in all probability, within the guidelines established by *National Securities.* The court found the injection into the challenged scheme of a non-insurance intermediary (Brown-Service) significant—not in any absolute sense,[7] but because it afforded a "guise" through which Liberty National might have exceeded the business of insurance and encroached upon the business of providing funeral services. 493 F.2d at 50.

*Battle,* although hardly dispositive of the present case, illustrates a point well-

---

7. We agree with the district court below that the injection of a non-insurance entity into an alleged scheme does not necessarily remove the scheme from the protection of the McCarran-Ferguson Act. *See Travelers Ins. Co. v. Blue Cross, supra.*

made. The attempted use of an established insurance market to secure an additional market in some non-insurance product or service is not, *by itself*, a part of the business of insurance.[8] We reject any such *per se* rule and proceed to an examination of those cases in which courts have found such arrangements to be a part of the business of insurance. Defendants cite *Royal Drug Company v. Group Life & Health Insurance Company*, 415 F.Supp. 343 (W.D.Tex.1976), and *Mathis v. Automobile Club Inter-Insurance Exchange*, 410 F.Supp. 1037 (W.D.Mo. 1976). Neither supports an affirmance here.

In *Royal Drug* plaintiff pharmacy owners challenged a scheme which Blue Shield had developed with a number of Texas pharmacies whereby participating pharmacies agreed to fill prescriptions for Blue Shield insureds and to receive reimbursements from Blue Shield at a specified, comparatively low, price. The court rejected plaintiff's argument that Blue Shield had exceeded the business of insurance and encroached upon the drug business. Noting that "the Pharmacy Agreement is a *direct* contractual relationship between the insurer and a provider of benefits, the result of which is simply the performance of the insurer's obligations owed to its insureds under the insurance contract and nothing more", the court plausibly concluded that such agreements "plainly relate to the 'relationship between. insurer and insured.' " 415 F.Supp. at 347, 348. This decision offers no support to defendants here. Even if there were a direct contractual relationship with respect to the activities alleged in the complaint, Pepco is most assuredly not a provider of benefits under Phoenix insurance policies and the result of any such contract is clearly not the performance of the insurer's obligations owed to its insureds under the insurance contract or anything remotely approximating that.[9]

In *Mathis v. Automobile Club Inter-Insurance Exchange, supra*, plaintiff alleged she was required to purchase a membership in an automobile club in order to obtain automobile insurance. The court, holding that the activities were a part of the business of insurance, indicated without elaboration that the suit was brought by a policyholder. 410 F.Supp. at 1040. It suffices for present purposes to note that the instant suit was filed by an agent, not a policyholder, that the insurer-policyholder relationship is at the "core" of the insurance business, and that the brief *Mathis* rationale is accordingly inapposite here.

In sum the tying decisions cited to us by defendants do not support a conclusion that the activities alleged in the complaint are a part of the business of insurance, and we are unwilling to find that they are merely because plaintiff's insurance agency was the instrument by which the restriction on securities dealings was sought to be imposed. There remain for consideration defendants' alternative contentions that the alleged activities concern the supervision and control of an insurance agent by its principal and that they bear upon the reputation of Phoenix as a reliable insurer.

C. *Agency Supervision and Control.*

Defendants contend that their activities are the business of insurance because they concern the supervision and control of an insurance agent by its principal. *National Securities* makes tangential reference to this theory by specifying that the insurance business does include "the licensing of companies and their agents." 393 U.S. at 460, 89 S.Ct. at 568.

■ We have no doubt that much, and probably most, of an insurance company's dealing with its agents is within the guidelines established by *National Securities.* A

---

8. *See also Hill v. Nat'l Auto Glass Co., Inc.,* 1971 C.C.H. Trade Cases ¶ 73,594 (N.D.Cal. 1971).

9. *Holly Springs Funeral Home, Inc., v. United Funeral Service, Inc.,* 303 F.Supp. 128 (N.D.

Miss.1969), is distinguishable from the present case on similar grounds, since it too concerned an alleged arrangement between insurance companies and providers of benefits under the policies.

number of cases so indicate.[10] On the other hand, not all decisions involving dealings between insurance companies and their agents have held the McCarran-Ferguson Act applicable.[11] Without attempting to express any definitive agreement or disagreement with the particular results reached in these cases, we think they collectively demonstrate that the applicability of the McCarran-Ferguson Act to alleged dealings between insurance companies and their agents must be decided on a case-by-case basis in light of the factors set out in *National Securities*. Such an approach, in our opinion, is the proper one. We thus eschew any invitation to adopt an inflexible rule that all such dealings are the business of insurance. *National Securities* demands a more scrutinizing approach.

 In each of the cases which held the McCarran-Ferguson Act applicable, the participation of the agent in the alleged scheme concerned the agent's insurance dealings as such. This factor, while perhaps not always decisive one way or the other, is a strong indication of whether the scheme does or does not have a bearing upon the core relationship between insurer and insured. The most nearly analogous of these cases is *Blackley v. Farmers Insurance Group, Inc.*, supra note 10, in which the plaintiff conceded that a requirement that an insurance agent be an exclusive agent was a part of the business of insurance. Assuming that the concession was a proper one, we view the situation here differently. The challenge in *Blackley* was directed to a requirement of an insurance company that its agents provide insurance services in a particular manner. In contrast, the challenge here is directed to a requirement by an insurance company that its agents provide securities services in a particular manner. The difference is significant. Since the restriction is not a restriction on the agent's dealings in insurance, we cannot give a talismanic effect to defendants' contention of agency supervision and control.[12]

Accordingly, defendants must demonstrate that the restriction on dealings in securities in some way affects the relationship between insurer and insured or otherwise satisfies the *National Securities* criteria.[13] In an effort to do so, defendants

---

**10.** *Commander Leasing Co. v. Transamerica Title Ins. Co.*, supra (alleged conspiracy between insurance companies and insurance agents to fix prices of title insurance held exempt); *Blackley v. Farmers Ins. Group, Inc.*, 1976–2 C.C.H. Trade Cases ¶ 61,061 (D.Utah 1976) (insurance group's requirement that insurance agent act exclusively as insurance agent for group held exempt); *Seidner v. Union Cen. Life Ins. Co.*, 1973–1 C.C.H. Trade Cases ¶ 74,561 (N.D.Ill.1970) (alleged conspiracy to "restrain [agent's] ability to participate in interstate insurance trade" held exempt); *California League of Ind. Ins. Pro. v. Aetna Cas. & Sur. Co.*, 175 F.Supp. 857 (N.D.Cal.1959) (alleged conspiracy to decrease the rate of commission paid to automobile insurance agents held exempt).

The *Commander Leasing* court, 477 F.2d at 86, observes:

In applying the McCarran Act, we see no reason to distinguish between a principal and an agent. It would appear to us that an insurance agent, as well as an insurance company, is engaged in the "business of insurance."

We agree, but it does not follow that all activities engaged in, whether by an insurance company or agent, are a part of the insurance business. *National Securities* is authority to the contrary.

**11.** *Allied Financial Services, Inc. v. Foremost Ins. Co.*, 418 F.Supp. 157 (D.Neb.1976) (alleged "pirating" by insurance company of agent's sub-agents held not exempt); *American Fam. Life Assur. Co. v. Planned Mkt. Assoc.*, 389 F.Supp. 1141 (E.D.Va.1974) (alleged conspiracy to induce insurance agents to switch principals held not exempt).

**12.** We do not intimate that the hiring and firing of insurance agents is not the business of insurance. To the contrary, we think it is. But the gravamen of plaintiff's complaint is that he was forced to sell securities through Pepco, and this is so regardless of the fact that plaintiff's refusal to accede allegedly precipitated the termination of his insurance agency with Phoenix.

**13.** Defendants point out that insurance companies have been held accountable for the acts of their agents and suggest that insurance companies could easily be found liable in certain cases for the misfeasance of their agents in selling securities. It follows, defendants con-

contend that the restriction protects the reputation of Phoenix as a reliable insurer. It is to this final contention that we now turn. .

### D. *Reliability of the Insurer.*

Lastly, defendants contend that plaintiff's securities dealings must be closely supervised in order to ensure the reputation of Phoenix as a reliable insurer. Defendants assert that it is only through agents that policyholders ordinarily come in contact with their insurer and that policyholders accordingly form their view of the reliability and integrity of their insurer through the agent with whom they deal. Less than scrupulous dealings in securities by an agent, it is concluded, would therefore adversely affect the insurer's reputation and good will. The district court accepted this reasoning. 410 F.Supp. at 1347. We do not find it implausible, but neither can we say, particularly on the facts of this case, that its applicability is so free from doubt as to be susceptible to resolution on a motion to dismiss.

It is clear that factfindings favorable to defendants would resolve the matter in their favor. *National Securities* specifically states: "Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class." 393 U.S. at 460, 89 S.Ct. at 568. A number of decisions have utilized this rationale, at least in part, in holding the McCarran-Ferguson Act applicable. *Commander Leasing Co. v. Transamerica Title Ins. Co., supra,* 477 F.2d at 83; *Proctor v. State Farm Mut. Auto. Ins. Co.,* 406 F.Supp. 27, 29 (D.D.C.1975); *Schwartz v. Commonwealth Land Title Ins. Co.,* 374 F.Supp. 564, 575, *supplemental opinion,* 384 F.Supp. 302 (E.D.Pa.1974).

It is not obvious to us, however, that an insurance agent's dealings in securities invariably have an effect upon the insurance company's reputation as a reliable insurer. So far as we are aware, this case presents that precise question to the federal courts for the first time, and, at least until such time as the federal courts may encounter a sufficient number of cases raising the issue to render the matter free from doubt, we cannot say that such is the case as a matter of law. For the present at least, we regard the question as one which is appropriately established or negated through normal factfinding processes.

We are especially reluctant to embrace the approach taken by the district court in light of the particular facts of this case. Plaintiff takes the position, certainly consistent with the allegations of the complaint, that the reliability justification is offered by defendants "tongue in cheek", that the only motive behind defendants' actions was a desire to foreclose on a portion of the securities market. We do not know what, if any, merit there may be in this position, but we are unwilling to discredit it out of hand. The complaint alleges that plaintiff was allowed to deal freely in securities until such time as Pepco was incorporated and began dealing in securities itself. There is accordingly a colorable inference that the requirement was *not* imposed to protect the reputation of Phoenix as a reliable insurer, since Phoenix did not impose it until Pepco engaged in securities sales. We by no means imply that a factfinder must draw this inference.[14] We do conclude, however, that a factfinder must, upon a presentation of whatever facts might support or negate such an inference, consider it.

---

tend, that insurance companies should be given wide latitude in supervising their agents' securities sales. This argument may well have a bearing upon the merits of the antitrust claim asserted by plaintiff, but it has little or no effect upon a conclusion that such activities are or are not the business of insurance.

**14.** The fact that Phoenix did not impose the requirement sooner cannot be used to prevent

defendants from arguing that the requirement was imposed as a reliability safeguard. There is no justification for suggesting that innovative controls on an agent's practices are necessarily imposed for reasons other than protecting the insurer-insured relationship or for freezing an insurer into retaining controls which, for one reason or another, it feels are not as effective as newer controls.

### III.

We have emphasized throughout that the substance of the alleged practice here challenged is a restraint on trading in securities, not a restraint on insurance trade, and it is this fact which has precipitated our careful scrutiny of the various rationales urged by defendants. For the reasons set forth above, we hold that defendants have not demonstrated to the degree of certainty required on a motion to dismiss that the activities alleged are a part of the business of insurance within the meaning of Section 2(b) of the McCarran-Ferguson Act.

The judgment appealed from is reversed. The cause is remanded to the district court for further proceedings not inconsistent with this opinion.

Reversed and remanded.