Robert W. CARD and R. W. Card & Associates, Inc., a Colorado Corporation, Plaintiffs-Appellants,

v.

NATIONAL LIFE INSURANCE COMPANY, a Vermont Corporation, Defendant-Appellee,

Equity Services, Inc., a Vermont Corporation, Lawrence Leland and William Ryan, Defendants.

No. 78-1180.

United States Court of Appeals, Tenth Circuit.

Argued July 19, 1979.

Decided Aug. 21, 1979.

Mary Lou Godbe, Salt Lake City, Utah (Alan E. Walcher, Ford G. Scalley, of Morgan, Scalley, Lunt & Kimble, Salt Lake City, Utah, Francis P. King and Robert A. Wherry, Jr., of Lentz, Evans & King, Denver, Colo., on the brief), for plaintiffs-appellants.

James E. Hautzinger, of Dawson, Nagel, Sherman & Howard, Denver, Colo. (Cassandra G. Sasso, of Dawson, Nagel, Sherman & Howard, Denver, Colo., on the brief), for defendant-appellee.

Before McWILLIAMS, DOYLE and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The issue presented in this antitrust action by an insurance agent and his firm against the defendant-appellee life insurance company and others is whether the trial court erred in its construction and application of the McCarran-Ferguson[1] exception, the result of which was a holding that it was inapplicable to the facts of the case. The allegation in the complaint is that the insurance company, which acted in concert with Equity Services, Inc. and the National Life General Agents Association, refused to deal with the plaintiffs.

Robert W. Card had been associated with National Life Insurance Company since 1966, and had been authorized to solicit applications for life insurance and annuity contracts issued by National Life and had been authorized, in addition, to sell shares of mutual funds, etc., through an associated company, a broker-dealer called Equity Services, Inc.

## PROCEEDINGS AND FACTS

The dispute came to a head when Card and his corporation, R. W. Card & Associates, sought to become a general agent for an insurance company other than National Life, which action was contrary to the contract between Card and National Life. The other insurance company was Provident Life & Accident Insurance Company. It was the signing of this general agent's contract with Provident Life that brought about the termination by National Life of Card's general agency with it. This occurred in February 1974.

The coconspirators in this alleged Sherman Act boycott are: National Life Insurance Company; an unnamed party, the General Agents Association of National Life, which consists of all of the general agents of that company; Lawrence Leland, an executive vice-president of National Life Insurance Company; and William Ryan, a general agent for National Life Insurance Company, who resides in San Francisco, California. It is said that other persons, firms and corporations participated in the unlawful combinations, conspiracies and agreements to boycott, coerce and intimidate.

The allegations in respect to § 1 of the Sherman Act are somewhat extensive, but they boil down to the conspiracy to terminate and the termination of Card's contract with National Life as a general agent.

1. 15 U.S.C. §§ 1012–1013.

The thread which runs through National Life's answer is that the company is exempt from the Sherman Act because it is an insurance company which is regulated by the laws of the several states, and is therefore covered by the exemption provisions of the McCarran-Ferguson Act and not subject to the exception set forth in that Act.

There seems to be little question but that Card, under his contract with National Life as a general agent, was precluded from entering into a general agency agreement with any other company. Card recognizes this, but makes the claim that his agreement with Provident was a personal producing general agent's contract which was limited in its terms and did not run contrary to his general agent contract with National Life.

The main contention of plaintiffs-appellants is that the McCarran Act, 15 U.S.C. §§ 1012–1013, does not exempt National Life's activity from the Sherman Act because the action taken by National Life in terminating the contract and refusing to deal with Card was in fact and in law an act which constituted boycott, coercion and intimidation.

The trial court gave careful consideration to this contention and concluded that in essence the action, if any, was in the nature of breach of contract, a suit which is subject to state court jurisdiction, but which falls short of being an act of boycott, coercion or intimidation. The district court decided this by applying the law on the subject, and particularly the exemption statutes referenced,[2] to the undisputed facts.

The thrust of the governing statute, as shown, is to remove the business of insurance from federal antitrust regulation. It provides that the Sherman Act, the Clayton Act and the Federal Trade Commission Act are not applicable to the business of insurance to the extent that such business is regulated by state law. Section 1013 carves out a single exception to nonapplicability of the antitrust laws, which is the agreement to boycott, coerce, intimidate, or acts of boycott, coercion or intimidation.

Additional facts regarded as important by the plaintiffs must be mentioned. Plaintiffs say that they are engaged in the business of providing insurance consulting services specializing in the use of insurance in corporate and estate planning. Card had been affiliated with the National Life Insurance Company of Vermont since 1964, and had held an Agent's Appointment Agreement with the said company since 1966. The most recent contract had been executed in 1971. Card states that he was regarded as an independent contractor and not an employee. Card, as an individual,

2. The McCarran Act, 15 U.S.C. §§ 1012 and 1013, provides as follows:

§ 1012. Regulation by State law; Federal law relating specifically to insurance; applicability of certain Federal laws after June 30, 1948

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

§ 1013. Suspension until June 30, 1948, of application of certain Federal laws; Sherman Antitrust Act applicable to agreements to, or acts of, boycott, coercion, or intimidation

(a) Until June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, and the Act of June 19, 1936, known as the Robinson-Patman Anti-Discrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof.

(b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

assigned his rights to commissions to Robert W. Card and Associates, Inc. As a consultant he had acquired considerable recognition not only from National Life but also from other insurance companies, had received awards, was a member of the President's Club, etc.

National Life Insurance Company is said to be one of the largest life insurance companies in the United States. It has a general agency system for marketing its insurance. The insurer appoints general agents who are responsible for actually merchandising products in the territory and also for training agents. The compensation is commissions.

The general agents of National Life have a corporation known as the General Agents Association, an entity said to be owned, controlled and financed by general agents with National Life. The general agents meet with the officers of National Life and the officers of National Life consult with the general agents about all major policy decisions. The agents are permitted to hold agent appointment agreements with competing insurance companies on a brokerage basis. The general agents are not allowed by National Life to hold any type of *general agent's contract* with a competing insurance company.

In January 1974, Card met with National Life's Vice-President, Lawrence W. Leland, and reached an informal agreement, whereby he would be allowed to place business with other companies so long as he gave fifty-one percent of the business to National Life.

In February 1974, Card met with Vice-President Johnston of Provident Life & Accident Insurance Company and negotiated a personal producing general agent's contract. He was told at that time that National Life would terminate him if he signed a general agent's contract with Provident. Such a contract was executed with Provident to be effective March 1, 1974.

Following some disagreements which Card had with one William Ryan, a San Francisco general agent who communicated to the home office that Card was contracting with companies other than National, and after having been told by one of Ryan's agents that "Ryan was out to get Card's contract with National Life terminated," Card contacted Leland at National Life, who said that his contract was not in jeopardy.

Following a meeting in Puerto Rico in April 1974, Leland was told by Ryan that Card had a general agent's contract with Provident. Leland verified this, and it was then that he terminated the Card contract.

Plaintiffs-Appellants make the following contentions:

First, that summary judgment should be sparingly used in antitrust litigation, and in essence had it been sparingly used, it would not have been granted here.

Second, that the trial court erred in concluding that plaintiffs had failed to allege or establish a Sherman Act boycott. Although some circuits have given the exception a very narrow interpretation which holds that the boycott exception should be limited to situations where agents or insurance companies have been blacklisted by combinations of insurance companies or agents, other circuits have taken a less restricted view. They have held that an antitrust action can be brought in cases amounting to boycott in accordance with the Sherman Act generally. Appellants say that under this latter approach they can recover. We must disagree.

In their brief appellants cite some factual material which they regard as particularly cogent in establishing the existence of a conspiracy having the object of boycotting Card and his associates, as follows: the policy of National Life prohibiting its agents from holding general agent's contracts with competing companies; participation of the general agents in the formulation of that policy; complaints by general agent William Ryan concerning Card's interest in representing insurers other than National Life; discussions among officers and general agents of National Life with Ryan at a General Agents' Association meeting immediately prior to the termina-

tion of Card's contract; the revelation by Provident Life to National Life that Card had signed a general agent's contract; the refusal of National Life to deliver agreed upon contracts to Card at the behest of the general agents; motivation for National Life agents to prevent Card from holding personal producing general agents' contracts with competing insurers.

## THE BOYCOTT QUESTION

It is our conclusion that neither the facts cited nor the law relied upon gave rise to an agreement to boycott, coerce or intimidate or of an act of boycott, coercion or intimidation.

The trial court, Judge Arraj, gave careful consideration to the issue before us and ruled against the plaintiff. The court granted the summary judgment on behalf of the defendants. The court said that undoubtedly the plaintiffs had shown the first two elements of §§ 1012–1013 in that they had established (1) that the activity constituted "the business of insurance," and (2) that it is regulated by state law, but had failed, the court continued, to establish that it was an act of boycott, coercion or intimidation. The court believed that the business of insurance, as used in the Act, was concerned with the relationship between the company and its policyholders and that the laws regulating this relationship, directly or indirectly, were the laws regulating the business of insurance. This was set forth in *Securities and Exchange Commission v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). National Life's regulation of its general agents, the court said, was part of the "business of insurance." Also, the court said that National Life meets the second requirement for a McCarran Act exemption—the regulation by state law.

Accordingly, the issue boiled down to whether or not the agreement constituted a boycott or was to coerce or intimidate.

In granting the summary judgment the district court held that the evidence failed to establish that this was true and that it was not necessary to determine the case under the narrow view. *See Meicler v. Aetna Casualty and Surety Co.*, 506 F.2d 732 (5th Cir. 1975); *Addrisi v. Equitable Life Assurance Society*, 503 F.2d 725 (9th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975); *Black v. Nationwide Mutual Insurance Co.*, 429 F.Supp. 458 (W.D.Pa.1977), *aff'd*, 571 F.2d 571 (3d Cir. 1978); *Blackley v. Farmers Insurance Group, Inc.*, 1976–2 Trade Cas. ¶ 61,061 (D.Utah 1976); *Transnational Insurance Co. v. Rosenlund*, 261 F.Supp. 12 (D.Or.1966).

The more liberal construction of the boycott exception is shown in *Barry v. St. Paul Fire & Marine Insurance Co.*, 555 F.2d 3 (1st Cir. 1977), *aff'd*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978); *Monarch Life Insurance Co. v. Loyal Protective Life Insurance Co.*, 326 F.2d 841 (2d Cir. 1963), *cert. denied*, 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964); *Ballard v. Blue Shield of Southern West Virginia, Inc.*, 561 F.2d 262 (4th Cir. 1976); *Proctor v. State Farm Mutual Automobile Insurance Co.*, 182 U.S. App.D.C. 264, 561 F.2d 262 (1977).

The only decisions in the Tenth Circuit are from district courts. One of these was by Judge Matsch in *Western Health Care Corp. v. Colorado Hospital Service*, No. 76–M–760 (D.Colo. Feb. 16, 1977). The narrow approach to the exception was adopted in that case.

The so-called narrow construction cases insist that Congress was engaged in preventing the blacklisting by the combinations of insurance companies, so this would have to be shown under that view.

The broader approach includes a concerted refusal to deal. *See Barry v. St. Paul Fire & Marine Insurance Co., supra,* and *Monarch Life Insurance Co. v. Loyal Protective Insurance Co., supra.*

The trial court said that the result was the same regardless of whether the narrow or the broad view was taken, because even adopting the broad view, the acts did not constitute a boycott under the Sherman Act. Even under the broader view, it is necessary that there be a combined, con-

certed refusal to deal which so threatens free competition as to constitute a per se violation of the Sherman Act. The primary issue for this court is whether the defendants violated the exception under the broad construction or the narrow one. In our view there was no violation under, either construction.

The United States District Court for the District of Utah, Judge Anderson, rendered a decision which dealt with the issues before us, *Blackley v. Farmers Insurance Group, Inc.*, 1976–2 Trade Cas. ¶ 61,061 (D.Utah 1976). As in our case, plaintiff was a terminated insurance agent who alleged that his termination by the insurance company pursuant to an exclusive general agent provision in his contract constituted a boycott. The court disagreed, saying that the essential activity protected was that of dealing with clients and the restriction of their right to choose companies freely. The court said that a restriction dealing with the plaintiff was not enough.

To the same effect is *Black v. Nationwide Mutual Insurance Co.*, 429 F.Supp. 458 (W.D.Pa.1977). The court there said that the practices in issue were governed by the state law and under state law the termination was not a boycott.

The Supreme Court in its 1978 term rendered its decision in *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). The Supreme Court's decision in *St. Paul* is helpful in considering the nature of a boycott in the present context. This was a class action by a number of licensed physicians and their patients against four insurance companies engaged in writing malpractice insurance in the State of Rhode Island. The allegation was that a conspiracy existed between three of the four companies in that they refused to deal on any terms with the policyholders of the fourth. This was a means of compelling them to submit to new ground rules set by the fourth, whereby coverage on an "oc-

currence" basis would not be renewed and coverage would only issue on a "claims made" basis.[3] The insurance companies moved to dismiss the antitrust claim contending that it was barred by the McCarran-Ferguson Act. This motion was granted by the district court. The court of appeals reversed, holding that the complaint stated a claim within the boycott exception in § 3(b) of that Act, the provision with which we are dealing.

The Supreme Court adopted the less restrictive view of the exception to the McCarran-Ferguson Act and affirmed the decision of the court of appeals. It resolved the issue whether the boycott exception applied to policyholders and insurers by concluding that it did. It did not, however, hold that the § 3(b) exception necessarily applied to "all concerted activity violative of the Sherman Act * * *."

The important ruling of the case was that the exception contained in § 3(b) of the McCarran-Ferguson Act applied not alone to concerted activity against competitive insurers and agents, but also to policyholders and insurers.

The opinion of the Court made a statement as part of its conclusion which is significant here. It said:

> Moreover, conduct by individual actors falling short of concerted activity is simply not a "boycott" within § 3(b). Cf. *Times Picayune v. United States*, 345 U.S. [594] at 625 [73 S.Ct. 872, 889, 97 L.Ed. 1277].

438 U.S. at 555, 98 S.Ct. at 2937.

The Supreme Court expressed its own definition of boycott. It said:

> The generic concept of boycott refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target. The word gained currency in this country largely as a term of opprobrium to describe certain tactics employed by parties to labor dis-

---

**3.** Footnote 3 explains the difference between an "occurrence" policy and a "claims made" policy. The latter is much narrower in its coverage. It applies only to claims made during the life of the policy, whereas the "occurrence" basis protects the policyholder from any act done while the policy is in effect.

putes. \* \* \* Thus it is not surprising that the term first entered the lexicon of antitrust law in decisions involving attempts by labor unions to encourage third parties to cease or suspend doing business with employers unwilling to permit unionization.

438 U.S. at 541, 98 S.Ct. at 2930.

The Court said that the boycotters and the ultimate target need not be in a competitive relationship with each other. The Court went on to say:

> This Court also has held unlawful concerted refusals to deal in cases where the target is a customer of some or all of the conspirators who is being denied access to a desired good or service because of a refusal to accede to particular terms set by some or all of the sellers.

*Id.*

The Court concluded that the conduct shown in *St. Paul* was within the common understanding of a boycott. The four insurance companies which controlled the market in medical malpractice insurance are alleged to have agreed that three of the four would not deal on any terms with the policyholders of the fourth. As a means of ensuring policyholder submission to new restrictive ground rules of coverage, St. Paul obtained the agreement of the other petitioners, strangers to the immediate dispute, to refuse to sell any insurance of its policyholders.

The *St. Paul* case differs substantially from our case. Nevertheless, it is helpful because it teaches that there must first be concerted activity by individual actors. There must also be present a boycott, the essence of which is the pressuring of a party with whom one has a dispute by withholding or enlisting others to withhold patronage or services from the target. The target can be a customer.

The decision in *St. Paul* thus furnishes guidance for considering whether a boycott exists in the present case. We hold that regardless of how it is considered there was not present the element of coercion.

## PRESENCE OF SEVERAL CONSPIRATORS

We have not overlooked the related issue on which Judge Arraj based his decision in the district court, namely, that all of the "conspirators" were part of National Life Insurance, whereby National was in effect conspiring with itself. On this we agree with Judge Arraj that the General Agents Association, consisting as it did of general agents of National Life Insurance Company, was really a part of the National Life Insurance Company structure and they could not be regarded as conspirators. The same is true of the defendant Ryan and the defendant Leland. Ryan is a general agent for National Life Insurance Company and Leland is executive vice-president, so they cannot be effective conspirators either. So, although we believe that it is of importance to go to the merits of the case, in so doing the problem of whether there is a boycott is the ultimate issue to be resolved. We nevertheless recognize that the presence of legally viable conspirators is also essential and is not unrelated to the boycott issue.

\*   \*   \*   \*   \*   \*

In sum, this case is lacking in all of the essentials necessary to fulfill the § 1013 requirement. Not only is there a deficiency in the area of conspirators, but also the evidence fails to establish an agreement to boycott, coerce or intimidate or an act of boycott, coercion or intimidation.

The judgment of the district court is affirmed.

McKAY, Circuit Judge, concurring:

I concur with the majority opinion insofar as it affirms Judge Arraj's conclusion that the parties alleged to have acted in concert could not, as a matter of law on the undisputed facts of this case, have committed among themselves a boycott of plaintiff in violation of the Sherman Act. I express no view on the other issues treated in the opinion.