MONARCH LIFE INSURANCE COMPANY, Appellant,

v.

LOYAL PROTECTIVE LIFE INSURANCE COMPANY, Appellee.

No. 172, Docket 28412.

United States Court of Appeals Second Circuit.

Argued Nov. 14, 1963.

Decided Dec. 19, 1963.

Certiorari Denied March 23, 1964. See 84 S.Ct. 968.

John W. Castles, 3d, New York City (Wendell Davis, Jr., and Lord, Day & Lord, New York City, of counsel), for appellant.

Donald M. Dunn, New York City (Robert R. Rich, Jr., Boston, Mass., Hamilton Fish, Jr., Thomas V. Heyman, and Alexander & Green, New York City, of counsel), for appellee.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

KAUFMAN, Circuit Judge:

Simply stated, the sole issue presented by this appeal is whether a private treble-damage action is available for illegal boycotts in the insurance industry.

In the McCarran Act of 1945, 15 U.S.C. §§ 1011–1015, Congress provided that the Sherman and Clayton Acts would be inapplicable to the business of insurance to the extent that the industry was regulated by state law. An exception was written into § 3(b) of the Act, however, to preserve the prohibitions of the Sherman Act, insofar as they related to boycotts and agreements to boycott. The present suit was instituted in the Southern District of New York by Monarch Life Insurance Company, and was based on allegations that defendant Loyal Protective Life Insurance Company had entered into an unlawful conspiracy to boycott Monarch in the sale and issuance of health and accident insurance in interstate commerce. Federal jurisdiction

was invoked under § 1 of the Sherman Act, 15 U.S.C. § 1, which outlaws agreements to boycott; § 4 of the Clayton Act, 15 U.S.C. § 15, which authorizes private treble-damage relief for all violations of the antitrust laws; and § 3(b) of the McCarran Act, 15 U.S.C. § 1013. Reading the McCarran Act narrowly, the District Court held that the exceptive provisions of § 3(b) related only to the Sherman Act, and could not be construed to embrace the treble-damage provision of the Clayton Act. In view of New York's extensive regulation of the insurance industry, the Court concluded that there was no statutory foundation for a private treble-damage action, and accordingly dismissed the complaint for lack of jurisdiction. Alleging that the Court's restrictive interpretation had emasculated the purpose of § 3(b), Monarch has taken this appeal.

Prior to 1944, the issuance of an insurance policy was not thought to constitute "commerce" among the several states, Hooper v. People of State of California, 155 U.S. 648, 655, 15 S.Ct. 207, 39 L.Ed. 297 (1895); New York Life Ins. Co. v. Deer Lodge County, 231 U.S. 495, 34 S.Ct. 167, 58 L.Ed. 332 (1913), and the insurance industry accordingly considered itself immune from federal antitrust regulation. See Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 414, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946). In United States v. Southeastern Underwriter's Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L. Ed. 1440 (1944), the Supreme Court dispelled any such illusions by holding the Sherman Act applicable to a fire insurance company which conducted a substantial inter-state business. Congressional response to this ruling was swift, and the following year the McCarran Act was passed in an effort to clarify the respective roles of the federal and state governments in the regulation of the insurance industry.

The fundamental purpose of the Act was simply and clearly stated in its first section: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S. C. § 1011. In furtherance of this general objective, § 2(b) of the Act provided that "[n]o Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012. While thus disclaiming any federal intention to preempt the field of insurance regulation, Congress went on to provide that the Sherman, Clayton, and Federal Trade Commission Acts would "be applicable to the business of insurance to the extent that such business is not regulated by State law." Ibid.

§ 3(b) of the Act, the center of the present controversy, was designed to exclude one class of cases from this general scheme of accommodation to state regulation. Thus, Congress declared that "[n]othing contained in this Act shall render the * * * Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

In 1945, when the McCarran Act became law, § 7 of the Sherman Act provided a treble-damage remedy for private individuals injured by Sherman Act violations. In 1955, however, this section was repealed, 69 Stat. 283; as is more than clear from the legislative history, H. R.Rep.No.422, 84th Cong., 1st Sess. 2 (1955), the repeal was merely designed to expunge a provision rendered superfluous by § 4 of the Clayton Act, which made the treble-damage remedy available to those injured by a violation of any antitrust law. Indeed, as both parties to the present appeal point out, § 7 had already become something of a dead letter in 1945. The provision was omitted from current editions of the United States Code, and the Clayton Act's § 4 had become the common vehicle for all private treble-damage actions, including

those instituted for substantive Sherman Act violations.[1]

The District Court was, therefore, faced with a real dilemma. By its literal wording, § 3(b) saved only provisions of the Sherman Act from non-applicability in the presence of state regulation of the sale of insurance; by virtue of the 1955 repeal, the Sherman Act no longer contained a section providing for private treble-damage actions; and the Clayton Act, upon which Monarch must depend for its treble-damage remedy, is, in the terms of § 2(b), applicable only "to the extent that (the business of insurance) is not regulated by State law."

Although recognizing that the only other court to consider the problem had reached a different result, Professional & Business Men's Life Ins. Co. v. Bankers Life Co., 163 F.Supp. 274 (D.Mont. 1958), the district court reluctantly concluded that § 3(b) could not be construed to authorize a private treble-damage action, even when the substantive conduct alleged was a boycott illegal under the Sherman Act. The court noted that its interpretation would not render § 3(b) nugatory; the federal government might still maintain actions for § 3(b) violations. While we can understand the court's refusal to depart from what it deemed the clear meaning of a congressional enactment, we feel that a contrary interpretation would be more in harmony with congressional intent. We are constrained, therefore, to reverse the judgment of dismissal.

■■ At the outset, we find ourselves unable to accept Loyal's contention that

Congress did not contemplate the existence of a treble-damage remedy at the time the McCarran Act became law. In passing the McCarran Act, Congress was attempting to return primary responsibility for insurance regulation to the states; only when a state had not acted, would federal legislation become effective. § 3(b), on the other hand, was designed to exempt certain types of cases from this general pattern of deference to state regulation; where boycotts, or agreements to boycott were concerned, the federal policy expressed through the Sherman Act was to be preeminent.

The congressional debates clearly manifest this purpose. Thus, Senator Ferguson, a co-sponsor of the bill, explained that "[t]here are certain things which a State cannot interfere with. It cannot interfere with the application of the Sherman Act to any agreement to boycott, coerce, or intimidate, or an act of boycotting, coercion or intimidation." 91 Cong.Rec. 1443 (1945). "[I]n other words," the Senator continued, "under the terms of the bill, there are six things on which a state could not legislate. They are boycott, coercion, or intimidation, or agreements to boycott, coerce or intimidate." 91 Cong.Rec. 1481 (1945). In the words of Senator O'Mahoney, a Senate conferee on the bill, "the great gain which has been achieved by the complete agreement of the Senate and House conferees [is that] agreements as well as acts of boycott, coercion and intimidation should be outlawed." 91 Cong.Rec. 1486 (1945).

1. § 4 of the Clayton Act has been codified as 15 U.S.C. § 15. A "historical note" appended to this section in the United States Code explains that 15 U.S.C. § 15 "applies to the provisions of this chapter generally and supersedes" § 7 of the Sherman Act which was "restricted in operation to the particular act cited." Both before and after the formal repeal of § 7 in 1955, litigants and courts alike would often cite this historical note, "15 U.S.C. § 15 note," as the statutory foundation for treble-damage actions instituted for substantive Sherman Act violations. See, e.g., Boro Hall Corp. v. General Motors Corp., 124 F.2d 822 (2d Cir. 1942), cert. den., 317 U.S. 695, 63 S.Ct. 436, 87 L.Ed. 556 (1942); Tobman v. Cottage Woodcraft Shop, 194 F.Supp. 83 (S.D.Cal.1961). We interpret this practice as resting on an assumption that the treble damage provision of § 4 had, in effect, become part of the Sherman Act. While this in itself would be a sufficient answer to appellee's contentions, we prefer to rest our decision on the clearly expressed intention of Congress, to be discussed, infra.

At this day and age, an exhaustive citation of authorities is hardly necessary to establish the fundamental role of the private remedy in federal antitrust law enforcement. This was no less true in 1945; the private right of action for treble-damages then, as now, supplied much of the teeth behind the federal government's attempt to eliminate anti-competitive practices and to free our economic system from the devitalizing influences of monopoly. It seems especially significant, therefore, that when Congress acted in § 3(b) expressly to preserve federal power over a limited class of antitrust violations in the insurance industry, it gave absolutely no indication that it intended to abandon the remedy which was traditionally so vital to the effective enforcement of the federal right. In the absence of any articulated suggestion that so radical a step was contemplated, it may not be lightly inferred. And the fact that the treble-damage remedy of § 7 of the Sherman Act was still on the books at the time of enactment further reinforces our conclusion. For, even if private litigants may, as a matter of preference, have employed § 4 of the Clayton Act, this hardly indicates that the treble-damage remedy had become obsolescent. As of 1945, then, we are convinced that the private treble-damage remedy was available for § 3(b) violations; since § 7 was still contained in the Sherman Act, even the most literal reader of the McCarran Act would be compelled to such a conclusion.

We are left with the question whether the 1955 repeal of § 7 carried with it the drastic consequences with respect to § 3(b) which Loyal urges. We cannot believe that it did. Congressional intention that the repeal be merely a housekeeping measure, designed to remove duplication, while leaving substantive rights undisturbed, was made abundantly clear on several occasions. Indeed, we find it inconceivable that Congress would radically alter the general pattern of antitrust law enforcement in such a roundabout, indirect and unobtrusive manner.

It is axiomatic that statutes are to be interpreted, whenever possible, to effectuate their underlying purpose and intention. United States v. Bryan, 339 U.S. 323, 338, 70 S.Ct. 724, 94 L.Ed. 884 (1949); Cawley v. United States, 272 F. 2d 443, 445 (2d Cir. 1959). And the English language is seldom so explicit that it may be interpreted in a vacuum. Thus Corbin has warned that a "word, appearing suddenly, in empty space and with no history, would express nothing at all. To be expressive of any meaning, all words must have a context and a history * * *" 3 Corbin, Contracts 90 (1960).

As he did in so many areas, Judge Learned Hand illuminated the proper method of statutory interpretation in language which bears continued reflection. In Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), he wrote that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." And in a speech delivered before the Massachusetts Bar Association in 1942, reprinted in "The Spirit of Liberty," Judge Hand considered the problems presented to a court confronted with a statute which requires interpretation. With his customary eloquence he stated that "[t]he duty of ascertaining its meaning is difficult at best, and one certain way of missing it is by reading it literally, for words are such temperamental beings that the surest way to lose their essence is to take them at their face. Courts must reconstruct the past solution imaginatively in its setting and project the purposes which inspired it upon the concrete occasions which arise for their decision."

When the language of § 3(b) is examined in the light of our understanding of congressional purpose, we do not find ourselves driven to adopt an in-

terpretation which flies in the face of the meaning intended by Congress. The statutory wording of § 3(b) provides that "[n]othing contained in this Act shall render * * * the Sherman Act inapplicable to any agreement to boycott." Since we find the treble-damage provision of the Clayton Act so basic to the effective enforcement of the Sherman Act, we feel that the interpretation adopted below *would* severely impair the applicability of the Sherman Act to "any agreement to boycott," despite the continued availability of governmental sanctions, both civil and criminal.[2] We would, accordingly, read the statute as intended to exclude certain forms of conduct—and not merely certain statutory sections—from the general pattern of deference to state legislation. Under our interpretation, all boycotts or agreements to boycott condemned by the Sherman Act are rendered subject to federal law; as the treble-damage provision of the Clayton Act is a significant part of that law, it remains applicable to all such conduct.

The complaint in the present suit alleges that Loyal and a former employee of Monarch conspired to boycott Monarch in the sale and issuance of health and accident insurance. While we express no opinion as to the merits of the claim, an agreement to boycott has clearly been alleged. Accordingly, we hold that Monarch was improperly denied the opportunity to prove that it was injured by conduct violative of the Sherman Act, and we reverse the judgment of dismissal, and remand the case for further proceedings.

Reversed and remanded.

**2.** It has been argued that the government would still be free to impose civil and criminal sanctions for § 3(b) violations, but we find this insufficient. As the Court of Appeals for the Ninth Circuit has said, the "broad scope of the antitrust laws, was part of the legislative scheme 'intended in the most comprehensive way to provide against combinations or conspiracies in restraint of trade or commerce'. * * * The Clayton Act was part of the overall plan and the 'right of the injured party to recover damages was intended to provoke greater respect for the Act.' * * * 'The treble-damage action was intended not merely to redress injury to an individual through the prohibited practices, but to aid in achieving the broad social object of the statute.'" Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 365 (9th Cir. 1955). See also United States v. Standard Ultramarine & Color Co., 137 F.Supp. 167, 171 (S.D.N.Y.1955).