Phillip M. PROCTOR, d/b/a Proctor Auto Service, et al., Appellants,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY et al.

No. 76–1183.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 22, 1976.

Decided June 17, 1977.

Rehearing Denied July 22, 1977.

Jerry S. Cohen, with whom Michael D. Hausfeld, Washington, D. C., was on the brief, for appellants.

Melvin C. Garbow, Washington, D. C., with whom James F. Fitzpatrick and Stephen M. Sacks, Washington, D. C., were on the brief, for appellee State Farm Mut. Auto. Ins. Co., also argued for certain other appellees.

John P. Arness, George W. Wise and Jonathan S. Kahan, Washington, D. C., were on the brief for appellee Liberty Mut. Ins. Co.

William Piel, Jr. and Robert M. Osgood, New York City, were on the brief for appellee The Travelers Indem. Co.

Robert A. Altman, Washington, D. C., was on the brief for appellee Nationwide Mut. Ins. Co.

John F. Bruce, Washington, D. C., was on the brief for appellee Allstate Ins. Co.

Jonathan T. Howe, Chicago, Ill., filed a brief on behalf of Automotive Service Councils, Inc., an amicus curiae urging reversal.

Denver H. Graham, Washington, D. C., entered an appearance for appellee Crawford & Co.

Richard A. Whiting, Washington, D. C., entered an appearance for appellee General Adjustment Bureau.

Before WRIGHT, McGOWAN and Mac-KINNON, Circuit Judges.

Opinion for the Court filed by McGOW-AN, Circuit Judge.

Dissenting Opinion filed by J. SKELLY WRIGHT, Circuit Judge.

McGOWAN, Circuit Judge:

Appellants, owners of four automobile repair shops, brought suit in the District Court alleging that the claims adjustment and settlement practices of five automobile insurance companies involved price-fixing and a group boycott in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. The District Court granted summary judgment in favor of the insurance companies, 406

F.Supp. 27 (D.D.C.1975), on the basis of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, which confers broad antitrust immunity upon the "business of insurance," to the extent such business is regulated by state law.[1] Although the McCarran Act provides that the Sherman Act shall remain applicable to "any agreement to boycott, coerce, or intimidate, [and to any] act of boycott, coercion, or intimidation,"[2] the District Court concluded that appellants' allegations were insufficient to satisfy this "boycott exception" to the McCarran Act's antitrust exemption.

On appeal the District Court's decision is challenged in two respects. Appellants assert, first, that the disputed insurance company practices are not the "business of insurance" within the meaning of the McCarran Act; and, second, that material issues of fact precluding summary judgment were raised under the boycott exception, properly construed. These questions are not free from difficulty, given the rhetorical imprecisions of the McCarran Act. Although we cannot agree with all of the District Court's reasoning on the boycott issue, we affirm.

## I

Appellants' complaint charged that appellees had engaged in a combination and conspiracy to (1) fix the prices at which automobile repairs are made and, more specifically, the hourly labor rates paid to repair shops, the time allowances for repair jobs, and the prices for parts used in making repairs; (2) coerce and intimidate repair shops to complete work for insured parties at the fixed prices; and (3) boycott shops, such as those owned by appellants, which refused to accede to the fixed rates.[3] Treble damages and injunctive relief were requested pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15.

After three years of extensive discovery, a more refined version of the price-fixing allegation emerged: appellants asserted that the five insurance companies had entered into a horizontal agreement to pay or reimburse their policyholders according to a common formula which involved the "prevailing labor rate," a standardized estimate of the amount of labor required, and a compulsory discount on parts. They characterized as the "core" of their case the alleged combination and conspiracy to utilize only the prevailing labor rate in adjusting and settling claims. Although it was not contended that the different insurance companies had in fact employed a common hourly rate at all times,[4] or agreed to set

1. Section 2(b) of the McCarran-Ferguson Act (hereinafter sometimes referred to as the "McCarran Act" or "the Act"), 15 U.S.C. § 1012(b), provides in relevant part:

    (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

2. Section 3(b) of the McCarran Act, 15 U.S.C. § 1013(b), states in full:

    (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimi-

date, or act of boycott, coercion, or intimidation.

3. The complaint also named as defendants two companies retained by automobile insurance companies for the purpose of adjusting and settling claims. Separate motions for summary judgment were granted in favor of these two defendants, and the allegations against them are not before us on this appeal.

    In addition to themselves, appellants purported to sue on behalf of a nationwide class consisting of approximately 9,200 repair shop owners and operators. Although the District Court denied certification of the class on March 26, 1974, and the propriety of that ruling is not at issue in the instant appeal, the Automotive Service Councils, Inc.—a trade association representing the automobile repair and service industry—has submitted a brief as *amicus curiae,* urging reversal of the summary judgment awarded to appellees on the basis of the McCarran-Ferguson Act.

4. Indeed, deposition testimony by appellant Hogg established that, in the community in which his shop was located, two of the insur-

the hourly rate at a particular dollar amount, appellants averred that the agreement to adhere to the prevailing rate had the illegal purpose and effect of slowing down legitimate increases in the price of repairs.

Elaborating somewhat on the claim of coercion and intimidation made in the complaint, appellants alleged that the horizontal agreement was implemented through "vertical arrangements" with "captive" or "preferred" repair shops who, under economic pressure, committed themselves to do repairs for insureds at the prevailing labor rate. Appellants were able to add little to their charge that appellees engaged in a group boycott of non-cooperative shops, contending only that each insurance company used drive-in claims facilities to set the amounts to be paid on each claim and, in some cases, directed insureds to preferred repair shops. It was not alleged that appellees had circulated lists of shops to be black-listed on the one hand or favored on the other, nor was it argued that individual insurance companies had entered into combinations or conspiracies with their policy-holders to boycott appellants' shops.

Appellees moved for summary judgment on two grounds: first, the asserted failure of appellants to adduce any evidence in support of their charges of horizontal agreement, and second, even assuming the truth of appellants' allegations, the immunity of the alleged practices from the federal antitrust laws by virtue of the McCarran-Ferguson Act. The District Court granted the motions on December 18, 1975, relying primarily on the second ground.

The court observed that the controverted practices, if in fact indulged by the insurance companies, would be an integral part of the claims adjustment and settlement process and, as such, would qualify as the "business of insurance" within the meaning of the McCarran Act. The court based this holding on its reading of the leading case of *SEC v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), and, more specifically, on the following conclusion:

> To conclude, the settlement and payment of damage repair claims is (1) a basic part of the contractual obligation owed by the insurance company to the insured, whether or not the payment is made to the insured or on his behalf, (2) directly affects the rate-making structure of the insurance company and the level of premiums to be charged, and (3) is connected directly with the writing of the policy, its interpretation and enforcement. The practices challenged here are *peculiar* to the business of insurance within the meaning of the McCarran Act.

406 F.Supp. at 30 (emphasis in original).[5] The court also found that the challenged practices are regulated by state law to the degree required to support an exemption from federal law under the Act.[6]

Appellants' attempt to avoid the McCarran exemption through allegations of boycott, coercion, and intimidation was rejected on both factual and legal grounds. The court concluded, first, that "the claims of dispute as to material fact in this connection are vague and lack adequate record support."[7] Second, and in the district judge's assessment "perhaps more important," the court held that even if appellants'

ance companies were using a labor rate of $8.00 per hour at the same time that two of the other appellees were preparing damage estimates on the basis of a $9.00 per hour rate.

5. Although omitted from this concluding paragraph, an additional proposition in support of the "business of insurance" holding appeared earlier in the court's opinion:

> The way and method an insurance company discharges claims under its policies relate closely to its status as a reliable insurer. 406 F.Supp. at 29.

6. *Id.* at 30–31. One of the appellants does business in Virginia and three in Pennsylvania. Accordingly, the District Court analyzed the law of those states to determine whether the state regulation requirement was satisfied.

7. *Id.* at 31. The court added:

> There appears to be no collective refusal to deal with plaintiffs since plaintiffs' services were utilized throughout the period of this suit by persons insured by plaintiffs. *Id.*

charges were sufficiently documented, the boycott exception would be inapplicable as a matter of law. This latter holding was rested on a line of lower court cases which had given a narrow construction to the exception, reading it only to encompass blacklists of insurance companies or agents by other insurance companies or agents. *Id.* at 32, *citing Transnational Insurance Co. v. Rosenlund*, 261 F.Supp. 12, 16–27 (D.Ore. 1966); *Mitgang v. Western Title Insurance Co.*, 1974 Trade Cas. ¶ 75,322, at 98,026 (N.D.Cal.1974); *Addrisi v. Equitable Life Assurance Society*, 503 F.2d 725 (9th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975); *Meicler v. Aetna Casualty & Surety Co.*, 506 F.2d 732, 734 (5th Cir. 1975), *aff'g* 372 F.Supp. 509 (S.D. Tex.1974).

## II

We are in substantial agreement with the District Court's reasoning on the "business of insurance" issue. Our differences are essentially matters of emphasis, and do not affect the ultimate conclusion that the practices challenged by appellants fall within the statutory phrase.

As the District Court recognized, analysis must begin with the Supreme Court's decision in *National Securities, supra.* In that case, the SEC brought suit against the corporate owner of an insurance company, claiming that misrepresentations in violation of Rule 10b–5 had been made in connection with the merger of the subsidiary and another insurance company. The Court held that state laws aimed at protecting the interests of shareholders of insurance companies do not regulate the "business of insurance" as that term is used in the McCarran Act, and that misrepresentations made to such shareholders accordingly are not immunized from suit under the federal securities laws. *See* 393 U.S. at 457–61, 89 S.Ct. 564.

In reaching this conclusion, the Court noted that the internal legislative history of the McCarran Act offers little guidance on the intended meaning of the words "business of insurance." Consequently, the Court relied heavily on an analysis of the Act's historical context, which it described as follows:

The McCarran-Ferguson Act was passed in reaction to this Court's decision in *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533 [64 S.Ct. 1162, 88 L.Ed. 1440] (1944). Prior to that decision, it had been assumed, in the language of the leading case, that "[i]ssuing a policy of insurance is not a transaction of commerce." *Paul v. Virginia*, 8 Wall. 168, 183 [19 L.Ed. 357] (1869). Consequently, regulation of insurance transactions was thought to rest exclusively with the States. In *South-Eastern Underwriters*, this Court held that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws, in particular, were applicable to them. Congress reacted quickly. Even before the opinion was announced, the House had passed a bill exempting the insurance industry from the antitrust laws. 90 Cong.Rec. 6565 (1944). Objection in the Senate killed the bill, 90 Cong. Rec. 8054 (1944), but Congress clearly remained concerned about the inroads the Court's decision might make on the tradition of state regulation of insurance. The McCarran-Ferguson Act was the product of this concern. Its purpose was stated quite clearly in its first section; Congress declared that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 59 Stat. 33 (1945), 15 U.S.C. § 1011. As this Court said shortly afterward, "[o]bviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408, 429 [66 S.Ct. 1142, 90 L.Ed. 1342] (1946).

* * * Under the regime of *Paul v. Virginia, supra*, States had a free hand in regulating the dealings between insurers and their policyholders. Their negotiations, and the contract which resulted, were not considered commerce and were,

therefore, left to state regulation. The *South-Eastern Underwriters* decision threatened the continued supremacy of the States in this area. The McCarran-Ferguson Act was an attempt to turn back the clock, to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation. As the House Report makes clear, "[i]t [was] not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *South-Eastern Underwriters Association* case." H.R.Rep. No. 143, 79th Cong., 1st Sess., 3 (1945).

*Id.* at 458–59, 89 S.Ct. at 567.

In light of this history, the Court concluded that the "business of insurance" was not intended to cover all of the activities of insurance companies, but was meant only to include activities centering around the insurance contract and the relationship between the insurance company and the policyholder, as well as other activities of insurance companies that relate closely to their status as reliable insurers:

The statute did not purport to make the States supreme in regulating all the activities of insurance *companies* ; its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply. Certainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* was all about. The selling and advertising of policies, *FTC v. National Casualty Co.*, 357 U.S. 560 [78 S.Ct. 1260, 2 L.Ed.2d 1540] (1958), and the licensing of companies and their agents, *cf. Robertson v. California*, 328 U.S. 440 [66 S.Ct. 1160, 90 L.Ed. 1366] (1946), are also with-

in the scope of the statute. *Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which Paul v. Virginia held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."*

*Id.* at 459–60, 89 S.Ct. at 568 (emphasis on last five sentences supplied).

■ Applying this standard to the facts before us, we have little doubt that what appellants have characterized as the "core" of their case, the alleged horizontal agreement to pay insureds' claims on the basis of the prevailing labor rate, as well as appellees' supposed adherence to a common formula to compute damage estimates, fits within the "core" of the "business of insurance." The essence of the automobile insurance contract is the insurance company's agreement, in return for a premium, to make payments to or on behalf of the policyholder for losses arising out of the ownership, maintenance, or use of an automobile. The determination by the insurance company of the amount to be paid in discharge of this contractual obligation is at the heart of the relationship between insurer and insured, and is directly connected with the reliability, interpretation, and enforcement of the insurance contract.

We have somewhat more difficulty with appellants' allegations of vertical arrangements with preferred shops and a group boycott of non-cooperative shops.[8] With re-

---

8. Of course, notwithstanding the fact that appellants have cast this set of allegations in terms of coercion, intimidation, and boycott, were we to find that these practices are outside

spect to these latter practices, there is at least a surface attraction to the argument pressed upon us by appellants, that what is involved here is the business of automobile repair rather than the business of insurance. Certainly, to the extent that these practices involve direct relationships between the insurance company and non-policyholders, and are less closely connected to the terms of the contract between the insurer and the insured, they are further from the core of the business of insurance.

Nevertheless, *National Securities* suggests that activities may be considered to fall within the business of insurance if they affect the relationship between the company and the policyholder "directly or indirectly." *See* 393 U.S. at 460, 89 S.Ct. 564, *quoted* on pp. ——————— at 182 U.S.App. D.C., at p. 267 at 561 F.2d *supra.* The question is ultimately one of line-drawing, based on the facts of the individual case. And, of course, the fact that a practice may affect other types of business is not dispositive of whether it is sufficiently related to the business of insurance to come within the McCarran Act's protection.

■ In the circumstances of this case, we conclude that the alleged agreements with preferred shops and the asserted group boycott of non-cooperative shops are connected closely enough to the contractual relationships between appellees and their policyholders, and with the reliability, interpretation, and enforcement of those contracts, to

qualify as the business of insurance.[9] *See Royal Drug Co. v. Group Life & Health Insurance Co.,* 415 F.Supp. 343, 347–48 (W.D.Tex.1976) (reaching similar conclusion with respect to agreements between medical insurance company and "participating pharmacies," establishing terms of reimbursement to pharmacies for drugs dispensed to policyholders). By the very terms of their allegations, appellants concede that these practices stemmed solely from appellees' desire to slow the rate of increase in the claims payments required to satisfy the companies' contractual obligations to their policyholders.[10] Notwithstanding their effect on non-policyholders, the activities unquestionably grow out of, and are tied to, the claims adjustment and settlement process. The arrangements with favored shops were designed to secure repair services for insureds at prices commensurate with the sums offered by the insurance companies in settlement of their obligations; and the group boycott, if successfully executed, would have prevented policyholders from using repair shops at which those sums might not provide compensation for repairs to the full extent guaranteed by the insurance contract.

Of central significance in this entire context is the close relationship between the cost of reimbursing damage claims, on the one hand, and the insurance rates charged by appellees, on the other.[11] Any doubt as

---

the scope of the "business of insurance," the McCarran Act would not shelter them from the antitrust laws, and we would not need to reach the question of the applicability of the boycott exception.

9. The District Court's characterization of the challenged conduct as "peculiar" to the business of insurance, *see* text accompanying note 5 *supra,* is perhaps a helpful way of stating this conclusion. *See American Family Life Assurance Co. v. Planned Marketing Assoc., Inc.,* 389 F.Supp. 1141, 1145 (E.D.Va.1974) ("In *National Securities* the court held that 'the business of insurance' pertained to those activities *peculiar* to the insurance industry.")

10. It is not contended that appellees' effort to give business to some shops, and take away business from other shops, was motivated by

reasons independent of the prices charged by those shops. Nor is it alleged that appellees were trying to drive existing body shops out of business in order to facilitate vertical integration by insurance companies into the auto repair industry. We therefore need not decide whether the presence of such factors would have placed the disputed activities outside the business of insurance.

11. The District Court made the following finding:

. . . claims-settlement procedures have a direct connection with an insurance company's rate-making structure. The record clearly shows a close relationship between the costs of automobile repairs in Pennsylvania and Virginia, the states where plaintiffs do business, and the levels of premiums charged by defendants to its insureds. It is a

to whether these activities should be deemed to fall within the business of insurance is ponderably eased by that economic reality. Indeed, in a case involving similar activities, the Third Circuit concluded that the substantial impact on rates, in and of itself, was sufficient to satisfy the statutory standard, based on the language in *National Securities* to the effect that the business of insurance includes "other activities of insurance companies [which] relate so closely to their status as reliable insurers." *Travelers Insurance Co. v. Blue Cross,* 481 F.2d 80, 82–83 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973), *citing National Securities, supra,* 393 U.S. at 460, 89 S.Ct. 564.[12] Although its reasoning was somewhat different, the District Court in the instant case also concluded that the vital impact of the practices in question on the rate-making structure necessarily meant that they should be included within the Congressional concept of the business of insurance:

> fact of life that the cost of repairs, including labor charges and the cost of repair parts, paid in the settlement of damage claims are an important factor in the rate-making structure of insurance companies obligated under their policies to pay damage claims. Claims-settlement practices which include activities complained of in this suit have a vital impact on rate-making . . . .

406 F.Supp. at 29 (footnote omitted).

This finding was supported by undisputed affidavits submitted by appellees, including an affidavit by State Farm's Chief Actuary, *stating* in relevant part:

> . . . the costs incurred when the Company pays insureds or third-party claimants comprise the largest single element in the premium structure. In 1974 the amount paid to insureds or third-party claimants to settle automobile physical damage claims in Virginia and Pennsylvania represented approximately 67.7% of total earned premiums allocated to physical damage coverages in those states. Obviously, costs of this magnitude have a direct impact on the premium levels charged for automobile insurance and the financial stability of a company such as State Farm.

App. 100. More particularly, appellants themselves assert that labor costs constitute over 50% of the insurance companies' total outlays for automobile repairs.

**12.** In the *Travelers Insurance* case, a private insurance company brought suit against Blue

[The] activities complained of in this suit have a vital impact on rate-making and must, of necessity, be included within the term "business of insurance."

\*    \*    \*    \*    \*    \*

. . . The "business of insurance" can touch relationships between insurance companies and non-policy holders such as automobile repair shops *when such relationships are closely connected with the insurer-insured relationship through the profound effect of the costs of damage claims in the rate-making structure.*

*See* 406 F.Supp. at 29–30 (emphasis supplied).

We need not decide whether the effect on insurance rates should be analyzed in terms of appellees' "status as reliable insurers" or, instead, in terms of its connection with the relationship between insurer and insured; nor must we decide whether a substantial effect on rates, standing alone, is enough to qualify an activity as the business of insurance.[13] For the purposes of this case, it is

Cross, claiming that Blue Cross had violated §§ 1 and 2 of the Sherman Act by coercing hospitals into signing a standard contract proscribing the amounts and terms under which Blue Cross would reimburse the hospitals for services rendered to its subscribers. The terms of the contracts were such that Blue Cross was able to offer lower rates than competing private insurance companies. Moreover, there was considerable economic pressure on the hospitals to sign the contracts, since those which refused to agree were not reimbursed by Blue Cross in amounts sufficient to cover their costs. *See* 481 F.2d at 82, 84 & n.12. Nonetheless, the Third Circuit held that the contracts qualified as the business of insurance, and were not achieved through "boycott, coercion, or intimidation."

**13.** The proposition that the business of insurance includes any practice which has a substantial impact on insurance rates apparently stems from a District Court case, *California League of Independent Ins. Producers v. Aetna Cas. & Sur. Co.,* 175 F.Supp. 857 (N.D.Cal. 1959), decided before the Supreme Court's decision in *National Securities. See Travelers Ins. Co. v. Blue Cross, supra,* 481 F.2d at 83; *Proctor v. State Farm, supra,* 406 F.Supp. at 29–30. The opinion in *National Securities* neither cites nor discusses *California League,* and at least one commentator has speculated that the *National Securities* standard for determin-

sufficient to say that the vital impact on appellees' rates, found by the District Court, provides additional support for our conclusion that the disputed practices are a part of the business of insurance.

While the reasoning and facts vary somewhat from case to case our conclusion is also supported by the numerous decisions, in addition to *Travelers Insurance* and *Royal Drug, supra,* which have upheld similar arrangements between insurance companies and suppliers of services to insureds, in the face of claims that the practices went beyond the business of insurance and involved boycotts, coercion, or intimidation as well. *E. g., Workman v. State Farm Mutual Automobile Ins. Co.,* Civ. No. 75–1799 (N.D. Cal., Sept. 16, 1976) (arrangements between automobile insurance company and automobile body repair shops); *Frankford Hospital v. Blue Cross,* 417 F.Supp. 1104 (E.D.Pa. 1976) (agreements between medical insurance company and hospitals); *Anderson v. Medical Service,* 1976 Trade Cas. ¶ 60,884 (E.D.Va., Feb. 10, 1976) (contracts between medical insurance company and physicians).

The decision of the Fifth Circuit in *Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39 (5th Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975), is not to the contrary. In that case, a burial insurance company had entered into a contract with its wholly owned subsidiary, under which the subsidiary agreed to furnish the merchandise and services guaranteed by the burial insurance policies. The subsidiary in turn entered into agreements with a number of funeral homes and directors, establishing those homes as "authorized" providers of services to the insurance company's policyholders, setting the terms by which the subsidiary would reimburse the homes for those services, and requiring the homes to use certain merchandise supplied or approved by the subsidiary. An antitrust action on behalf of the class of affected funeral homes and directors was brought against the insurance

company and its subsidiary, but the trial court granted a motion to dismiss for failure to state a claim, in part on the basis of the McCarran-Ferguson Act. The Fifth Circuit reversed, holding with respect to the McCarran Act defense that further factual development was required before the trial court properly could determine whether the activities in question were part of the business of insurance. *See id.* at 49–51.

In reaching this holding, however, the court carefully distinguished *Travelers Insurance,* in words which might apply equally well to the arrangements between appellees and the repair shops in the case at bar:

> Significantly, the relationship between the insurance company and the hospitals in *Blue Cross* was a direct contractual relationship. The result of this contract was simply the performance of the insurer's responsibilities owed to the insured under the insurance contract and nothing more.

*Id.* at 50 (footnote omitted). The court emphasized that the case before it did not merely involve direct relationships between the insurance company and providers of services to insureds, but instead involved an additional party—an "intermediary"—under whose guise the insurance company "may have exceeded the business of providing burial insurance and encroached upon the business of providing funeral services." *See id.* There is, of course, no such intermediary here and, consequently, the danger that appellees have gone beyond the business of insurance is less pronounced. *See also* note 10 *supra.*

Appellants and *amicus* place heavy reliance on the decisions of the District Court for the Northern District of California in *Hill v. National Auto Glass,* 293 F.Supp. 295 (N.D.Cal.1968), 1971 Trade Cas. ¶ 73,594 (N.D.Cal., June 1, 1971), holding that an automobile insurance company was not engaging in the business of insurance when it directed its policyholders to selected glass

ing what constitutes the business of insurance was intended to be narrower than the "effect on rates" criterion relied upon in *California League.* Comment, *The McCarran Act's Anti-*

*trust Exemption for "The Business of Insurance": A Shrinking Umbrella,* 43 Tenn.L.Rev. 329, 344–46 (1976).

shops for the purchase and installation of automobile windshields. But that case is distinguishable on its facts since the activities at stake presumably did not have a substantial impact on insurance rates, *see Travelers Insurance Co. v. Blue Cross, supra,* 481 F.2d at 83, and it was not conceded, as it is here, that the insurance company's only purpose was to minimize increases in the cost of reimbursing damage claims, *see* note 10 & accompanying text *supra.* To the extent that the reasoning in these decisions is nevertheless inconsistent with our holding, we must respectfully disagree. We note, however, that under our construction of the boycott exception, to which we now turn, the ultimate result in *Hill* conceivably might have been the same in any event, since a principal allegation there was that defendants had conspired to boycott plaintiff's glass shop. *See* 293 F.Supp. at 296.

### III

Without express acknowledgement by any of the courts of appeals that have ruled on the matter, a split in the circuits seems to have developed as to the proper scope of the McCarran Act's boycott exception. The District Court in the instant case invoked the narrow construction—limiting the exception to boycotts of insurance companies or agents by other insurance companies or agents—which has been adopted by the Fifth and Ninth Circuits. *See Meicler v. Aetna Casualty & Surety Co.,* 506 F.2d 732, 734–35 (5th Cir. 1975); *Addrisi v. Equitable Life Assurance Society,* 503 F.2d 725, 728–29 (9th Cir. 1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975). *But see Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39, 51 (5th Cir. 1974),

*cert. denied,* 419 U.S. 1110, 95 S Ct. 784, 42 L.Ed.2d 807 (1975).

On the other hand, there are three circuits whose decisions appear to be premised on a broader construction. In *Monarch Life Insurance Co. v. Loyal Protective Life Insurance Co.,* 326 F.2d 841 (2d Cir. 1963), *cert. denied,* 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964), the Second Circuit regarded the boycott exception as covering "all boycotts or agreements to boycott condemned by the Sherman Act," *id.* at 846, although the facts of the case would have fit within the narrow construction since the suit alleged that one insurance company had participated in a conspiracy to boycott another insurance company. A recent decision of the Fourth Circuit, holding a complaint to have stated a claim falling within the boycott exception, also applied this general approach of construing the exception to cover any boycott prohibited by the Sherman Act; but in that case the allegations would not have come within the narrow interpretation and, indeed, were similar in some respects to the charges in the instant case. *Ballard v. Blue Shield,* 543 F.2d 1075, 1078 (4th Cir. 1976).[14] Finally, in *Travelers Insurance Co. v. Blue Cross, supra,* the Third Circuit considered on its merits, and rejected without stating what it considered to be the proper scope of the boycott provision, a claim that went beyond a mere blacklist of insurance companies or agents—in particular, a claim that Blue Cross had coerced hospitals into signing its standard contract setting the terms of reimbursement for services rendered to its policyholders. *See* 481 F.2d at 84; note 12 *supra.*[15]

---

**14.** In *Ballard,* a group of chiropractors charged that six corporations that sell Blue Cross-Blue Shield health insurance, their physician-directors, and a state medical association had "conspired to refuse insurance coverage for the services offered by chiropractors, to refuse payment of claims for services rendered by chiropractors even though claims for identical services rendered by physicians are honored, and to refuse permission for chiropractors to participate as officers in the companies offering Blue Shield Plans." 543 F.2d at 1078. The complaint asserted that the purpose and effect

of these practices was to eliminate competition from chiropractors in the health services field. *See id.* at 1077. The court held that these allegations stated a claim of group boycott in violation of the Sherman Act and, therefore, were within the boycott exception to the McCarran Act. *Id.* at 1078.

**15.** Travelers did not challenge the finding of the trial court that Blue Cross had at no time tried to influence the relationship between hospitals and other insurance companies, *see* 481

We agree with those circuits which have declined to adopt the narrow construction of the boycott exception, although, as we shall explain in Part IV below, we do not find sufficient guidance for our purposes in the general proposition that the exception encompasses all acts of boycott, coercion, or intimidation, and all agreements to boycott, coerce or intimidate, that are prohibited by the Sherman Act. Certainly there is no hint in the plain language of the provision that only acts and agreements directed against insurance companies or agents were to be subject to the exception. And our examination of the legislative history of the provision, and the target at which it was aimed, convinces us that no such limitation was intended.

The narrow construction apparently was first articulated in *Transnational Insurance Co. v. Rosenlund*, 261 F.Supp. 12 (D.Or. 1966), and was grounded in that court's reading of the legislative history of the boycott provision:

> The legislative history shows that the boycott, coercion and intimidation exception, was placed in the legislation to protect insurance agents from the issuance by insurance companies of a "black-list," which would name companies or agents which were beyond the *pale*. This list, in effect, was a directive to an agent not to write insurance in the name of or for the black-listed company; otherwise, he would be stripped of his agency and not permitted to write insurance for any of the members of the governing organization of insurance companies.[1]
>
> [1] 91 Congressional Record, p. 1087 (79th Congress, 1st Session.)

F.2d at 84, and thus no allegation of boycott was at issue in that case.

**16.** The bill which emerged from the Senate expressly covered agreements as well as acts, but the bill reported out of the House Judiciary Committee—the bill to which Congressman Celler was addressing himself—only referred to acts. As the current statutory language evidences, *see* note 2 *supra*, Congressman Celler's position prevailed in the Conference Committee. *See* 91 Cong.Rec. 1088 (1945) (Congressman Walter agrees to accept express language on agreements when the bill goes to confer-

*Id.* at 26–27 (emphasis in original). This passage was heavily relied upon by the District Court here, *see* 406 F.Supp. at 32, and in each decision cited by the District Court to support its reading of the boycott exception, *see Meicler v. Aetna Casualty & Surety Co., supra,* 506 F.2d at 734, 372 F.Supp. at 509; *Addrisi v. Equitable Life Assurance Society, supra,* 503 F.2d at 728–29; *Mitgang v. Western Title Insurance Co.,* 1974. Trade Cas. ¶ 75,322, at 98,026 (N.D.Cal. 1974).

Yet *Transnational* cited only a single page from the Congressional Record to support its interpretation, 91 Cong.Rec. 1087 (1945), and the only relevant material on that page is a speech on the floor of the House by Congressman Celler merely urging that the boycott exception be drafted so as to cover, in express terms, *agreements* to boycott, coerce, or intimidate, as well as *acts* of boycott, coercion, or intimidation.[16] While it does emphasize the importance of preventing insurance companies and agents from blacklisting other insurance companies and agents, there is nothing in the speech to indicate that such activities are the only ones comprehended by the boycott exception. And *Meicler, Addrisi,* and *Mitgang* neither cite nor discuss any additional materials from the legislative history which might support their position.[17]

The House and Senate Committee Reports on the bill which ultimately became the McCarran Act provide strong evidence that the boycott exception was not intended to be confined to blacklists of insurance companies or agents. In its section-by-section analysis of the bill, the Senate Report describes the boycott provision as follows:

ence, asserting that House language covering acts would have encompassed agreements in any event); *id.* at 1396 (text of bill as it emerged from conference).

**17.** It should be noted that the *Transnational* court did not rest its rejection of the boycott allegations in that case solely on its reading of the legislative history of the boycott provision. Rather, the court proceeded to examine the record carefully, and concluded that there was no evidence of any kind of boycott falling within the Sherman Act. *See* 261 F.Supp. at 27–28.

[The boycott section] provides that at no time are the prohibitions in the Sherman Act against *any agreement or act* of boycott, coercion, or intimidation suspended. These provisions of the Sherman Act remain *in full force and effect.*

S.Rep. No. 20, 79th Cong., 1st Sess. 3 (1945) (emphasis supplied). The House Committee Report contains a virtually identical statement.[18]

We have examined the floor debates in the House and Senate and have found nothing to shake our conclusion that the narrow construction adopted by the District Court must be rejected. Although there is at least one reference, other than Congressman Celler's, to blacklists of insurance companies and agents, *see* 91 Cong.Rec. 1485–86 (1945) (remarks of Sen. O'Mahoney), it demonstrates only that such blacklists were *a* concern of the Congress—perhaps even the principal concern—but does not show that they were the *only* concern. Indeed, other remarks by the same speaker, Senator O'Mahoney (one of the bill's managers), indicate that his concern was more general: he was at pains to make clear that while the McCarran Act approved state regulation of the business of insurance, it did not sanction "regulation by private combinations and groups." *Id.* at 1483.[19] And it is not surprising that blacklists of insurance companies and agents should be singled out as an example of the conduct to be prohibited, since such practices were apparently widespread prior to the Act. *See id.* at 1087

(remarks of Congressman Celler); *id.* at 1485–86 (remarks by Senator O'Mahoney).

A close reading of *United States v. South-Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which precipitated the passage of the McCarran Act, and upon which the Supreme Court relied heavily to determine the meaning of the "business of insurance," *see* Part II *supra,* provides further support for our conclusion. The indictment in that case alleged a conspiracy by an association of insurance companies and agents, along with its members, to fix premium rates and monopolize the insurance business. But the indictment also charged additional violations of the Sherman Act, involving practices in aid of the price-fixing and monopolization scheme; and the Supreme Court used the terms "boycott," "coercion," and "intimidation" to describe these additional practices. *See* 322 U.S. at 535–36, 64 S.Ct. 1162, *quoted in* note 20 *infra.*

It is thus apparent that the boycott provision of the McCarran Act was intended to preserve *South-Eastern Underwriters* to the extent that the latter subjected acts of "boycott, coercion, or intimidation" to the prohibitions of the Sherman Act. And the Supreme Court's opinion reveals that, while a blacklist of insurance companies and agents was alleged, another type of boycott was also involved: *policyholders* of insurance companies that were not members of the association "were threatened with boycotts and withdrawal of all patronage."[20]

---

18. H.R.Rep. No. 143, 79th Cong., 1st Sess. 3 (1945). The only difference is that the House Report refers to "any *act* of boycott, coercion, or intimidation" whereas the Senate Report, in the first sentence quoted, refers to "*any agreement or act* of boycott, coercion, or intimidation." This difference reflects the fact that the bill reported out of the House Committee did not expressly cover agreements, whereas the Senate version did. *See* note 16 and accompanying text *supra.*

19. Senator O'Mahoney assessed the import of the boycott exception as follows:

   .  .  . any attempt by a small group of insurance companies to enter into an agreement by which they would penalize *any person or any business* which was attempting to do business in the insurance field in a way

that was disapproved by them, would be absolutely prohibited by this provision.

91 Cong.Rec. 1480 (1945) (emphasis supplied).

20. The Court's opinion describes the acts of boycott, coercion, and intimidation as follows:

   \* \* \* The conspirators not only fixed premium rates and agents' commissions, but employed boycotts together with other types of coercion and intimidation to force nonmember insurance companies into the conspiracies, *and to compel persons who needed insurance to buy only from S.E.U.A. members on S.E.U.A. terms.* Companies not members of S.E.U.A. were cut off from the opportunity to reinsure their risks, and their services and facilities were disparaged; independent sales agencies who defiantly represented non-S.E.U.A. companies were pun-

We find it hard to believe that Congress would have intended a construction of the boycott provision which excludes from its sweep activities explicitly addressed in the case from which its language is drawn.

## IV

The narrow construction of the boycott provision has the virtue of embodying a bright-line test, at least to the extent that all activities which are not directed against insurance companies or agents automatically fall outside the exception. As a result of our rejection of this construction, we must face the delicate task of determining whether the practices alleged by appellants constitute "boycott, coercion, or intimidation" within the meaning of this provision. The District Court feared that to read the boycott provision to include any of these practices would "emasculate" the antitrust exemption provided by the McCarran Act. 406 F.Supp. at 32, *quoting Meicler v. Aetna Casualty & Surety Co., supra,* 506 F.2d at 734. *See also Addrisi v. Equitable Life Assurance Society, supra,* 503 F.2d at 729. Although we recognize that the terms of the provision are not self-defining, and are capable of being read in such a way as to swallow the antitrust exemption, we do not think the solution is to restrict the boycott exception in a manner unsupported by its plain language, its legislative history, or the historical context in which it was passed. Rather, the terms must be applied in such a way as to accommodate the respective purposes of the Act's antitrust exemption, on the one hand, and the boycott exception to that exemption, on the other.

The facts in *South-Eastern Underwriters* are a useful guidepost. Logically speaking, a simple agreement among insurance companies to charge certain premium rates could be viewed as a boycott agreement, since its observance would result in a collective refusal to deal with policyholders except at a fixed price. *See* P. Areeda, Antitrust Analysis 380–81 (2d ed. 1974). But the Supreme Court's opinion in *South-Eastern Underwriters* did not characterize the basic rate-fixing agreement in that case in terms of "boycott, coercion, or intimidation"; those terms were reserved for the additional activities utilized to enforce the agreement. Since the McCarran Act was passed in response to *South-Eastern Underwriters,* and since a construction of the boycott provision to encompass a simple rate-fixing agreement would indeed emasculate the Act's antitrust exemption, it is reasonable to infer that in a rate-setting context something in the way of enforcement activity would be required to make out a claim of "boycott, coercion, or intimidation" within the meaning of the Act.[21]

Similarly, in the case at bar, appellants' contention that the insurance companies entered into a horizontal agreement to pay or reimburse insureds according to a common formula based on the prevailing labor rate would not, as such, state a claim under the boycott provision, even though such an agreement could perhaps be characterized as a collective refusal to deal except at the prevailing rate. Nor are the ar-

---

ished by a withdrawal of the right to represent the members of S.E.U.A.; *and persons needing insurance who purchased from non-S.E.U.A. companies were threatened with boycotts and withdrawal of all patronage.* The two conspiracies were effectively policed by inspection and rating bureaus in five of the six states, together with local boards of insurance agents in certain cities of all six states.
322 U.S. at 535–36, 64 S.Ct. at 1164 (emphasis supplied).

21. In the *Meicler* case decided by the Fifth Circuit, it appears that the alleged boycott consisted of nothing more than adherence by a group of insurance companies to premium rates set by a state regulatory agency, or perhaps by private agreement. Although "[i]t cannot be disputed that the terms boycott and coercion, as commonly defined, might be construed to encompass [this] type of activity," *Meicler, supra,* 372 F.Supp. at 513, the foregoing analysis convinces us that the Fifth Circuit was correct in concluding that the boycott exception was not satisfied, and that a contrary result would "emasculate" the Act's antitrust exemption. *See* 506 F.2d at 734. Of course, the fact that we would reach the same result without relying upon the narrow construction of the boycott provision serves to illustrate that such a construction is not itself necessary to avoid emasculation of the Act.

rangements with preferred shops, in and of themselves, enough to make out a claim of coercion or intimidation. To be sure, even without the threat of a complete boycott of those shops which charge more than the prevailing rate, repair shops would be under economic pressure to accede to the terms of the horizontal agreement and thereby achieve favored status. But so long as policyholders are not prevented from utilizing non-preferred shops, the degree of coercive enforcement activity required to convert mere cooperation or concert of action into "boycott, coercion, or intimidation" is not present. *Compare Travelers Insurance Co. v. Blue Cross, discussed in note 12 supra,* 481 F.2d at 84 (economic pressure on hospitals to sign agreements with Blue Cross did not amount to "coercion"), *with Battle v. Liberty National Life Insurance Co., supra,* 493 F.2d at 51 (threats to build competing facilities and cancel contracts of funeral homes refusing to cooperate, in addition to acts of physical violence, held to state a claim of boycott, coercion, or intimidation).

■ By the same token, the allegation that appellees engaged in a group boycott of repair shops which refused to accede to the prevailing labor rate does state a claim within the boycott exception.[22] There is a distinction, we believe, between telling policyholders the amount of reimbursement they will receive and informing them as to the repair shops which have agreed to accept this amount as payment in full, on the one hand, and collectively refusing to allow policyholders to use their reimbursement checks at shops other than the preferred shops, on the other. Whereas the former merely exerts economic pressure on the shops, the latter unnecessarily penalizes nonfavored shops, and stifles any market pressure in the direction of increased prices by preventing policyholders from dealing with shops which charge more than the prevailing rate. Moreover, in the latter situation, legitimate increases in the actual labor rate are less likely to get reflected in

the amounts paid by the insurance companies, and the profit margins of even the preferred shops might get squeezed unfairly. Such collective use of the insurance companies' power, to enforce the terms of a horizontal price-fixing agreement, would thus constitute "boycott, coercion, or intimidation" within the meaning of the boycott provision.

### V

■ The question at this stage of the proceedings is whether appellants have come forward with sufficient evidentiary support for their allegation of a group boycott to justify a full trial on the merits of that claim. *See, e. g., E. P. Hinkel & Co. v. Manhattan Co.,* 165 U.S.App.D.C. 140, 506 F.2d 201, 205 (1974). Rule 56(e) of the Federal Rules of Civil Procedure provides that a party opposing summary judgment "may not rest upon the mere allegations . . . of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Although caution must be used in granting summary judgment in complex antitrust actions, *see, e. g., Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the dictates of rule 56(e) are fully applicable, and significant evidence substantiating the theory of the complaint must be produced, if a well-supported motion for summary judgment is to be defeated. *See, e. g., Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 686–87, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *First National Bank v. Cities Service Co.,* 391 U.S. 253, 274–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Solomon v. Houston Corrugated Box Co.,* 526 F.2d 389, 393–96 (5th Cir. 1976); *ALW, Inc. v. United Air Lines, Inc.,* 510 F.2d 52, 54–57 (9th Cir. 1975). As the Supreme Court noted in *First National Bank v. Cities Service Co., supra,* 391 U.S. at 289–90, 88 S.Ct. at 1593;

---

**22.** We need not decide whether the boycott exception would be satisfied by a claim that each insurance company, acting independently of the other insurance companies, entered into

a combination or conspiracy with its policyholders to boycott appellants' shops, since appellants have only charged a group boycott by the insurance companies themselves.

. . . Rule 56(e) should [not], in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations . . . . . While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

■ The District Court concluded that appellants' allegation of a group boycott lacked adequate record support. *See* text accompanying note 7 *supra.* We agree, and therefore, notwithstanding our disagreement with the District Court's narrow construction of the boycott provision, the grant of summary judgment in favor of appellees must be upheld.

We note, first, that appellants' own deposition testimony shows that during the relevant time period each in fact transacted business with policyholders of most, if not all, of the insurance companies presently before us. This does not conclusively rebut appellants' claim, since the alleged group boycott may only have been partially successful or, alternatively, the conspiracy may have been designed only to reduce, not completely eliminate, transactions with non-cooperative shops.[23] But the absence of a complete refusal to deal did make it all the more important, if appellants wished to survive summary judgment, for them to come forward with some additional evidence tending to prove a tacit or express boycott agreement among appellees.

Appellants have devoted most of their brief to a rambling description of the documents in the record which, in their view, create a genuine issue of fact with respect to the boycott claim. But, try as they might, they have been unable to point to any evidence whatsoever, in a ten-volume record supplemented by several boxfuls of materials compiled during three years of extensive discovery, that supports the existence of a contract, combination, or conspiracy among appellees to boycott non-cooperative shops.

None of the documents cited by appellants show any contacts between or among appellees in furtherance of a boycott arrangement; and there is no evidence of a blacklist of disfavored repair shops, or any collective decisions as to which shops should receive preferred status. The most that can be said is that several of the insurance companies may have adopted similar techniques for controlling their spiraling claims payments, such as establishing drive-in claims facilities and directing insureds away from "non-captive" repair shops. Since those techniques apparently were in the independent self-interest of each individual insurance company which adopted them, regardless of what the other insurance companies decided to do, this evidence of parallel conduct does not in any way tend to establish a boycott agreement, tacit or otherwise. *See* Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655, 681 (1962).

The grant of summary judgment in favor of appellees is, accordingly,

*Affirmed.*

J. SKELLY WRIGHT, Circuit Judge, dissenting:

The court, after rejecting the legal principles relied on by the District Court in granting summary judgment to appellees, analyzes the evidence itself and comes to the same result. While the temptation to avoid jury trials in antitrust cases is understandable, I would resist that temptation in this case since I believe the evidence of-

---

**23.** We cannot agree with the District Court's opinion to the extent that it is premised on the belief that a total refusal to deal is necessary to prove a group boycott in violation of the Sherman Act. *See* note 7 *supra.*

fered by both sides on the motion for summary judgment was sufficient to have a jury resolve, on proper instructions, the issues raised relating to the business of insurance, conspiracy, and boycott. The Supreme Court has cautioned against affirming summary judgments in antitrust cases by drawing inferences from the evidence that should have been reserved for the jury. *See, e. g., Poller v. CBS, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). This caution applies, in my judgment, with particular emphasis where the District Court has granted summary judgment after applying the wrong legal principles to its appraisal of the evidence.

Most of the evidence offered by both sides on appellees' motion for summary judgment is fairly outlined in the court's opinion. On that evidence a jury could reasonably have found, as appellants suggest, that the conspiracy consisted of an agreement among appellee automobile insurers to gain an advantage over their competitors by limiting appellees' cost of car repairs through boycott of car repairmen who refuse to make car repairs at the dictated prices.

In addition, other evidence fairly shows that the automobile repair industry is one marked by competition as to both price and quality of service. It would also support a finding that insurers were concerned that poor service caused by paying too low a rate for repairs would lead to dissatisfaction among insureds. Accordingly, it is not unreasonable to suggest, as appellants have done, that a jury could conclude that concerted action was needed if appellee insurance companies were to achieve both low cost repairs and adequate service. The record would also support a finding that appellee insurance companies sought to attain that objective by communicating among themselves on such matters as the most effective use of the insurers' drive-in claim service where claims would be adjusted and checks drawn for presentation to "captive" repair shops. In addition, there is evidence that some insurers issued two-party settlement checks naming as payees the insured and a "captive" body shop. Obviously the effect of this activity was to steer customers away from disfavored shops and would, in my opinion, justify a finding of boycott, especially since such steering would seem an integral part of effectuating the insurers' plan to direct volume business to their "captive" shops, thereby putting price pressure on independents.[1]

By sketching the evidence favorable to appellants, I do not mean to suggest that a reading of boycott or conspiracy in restraint of trade is inevitable on the evidence in this case. Certainly the majority has a point in its observation that persons acting independently might have an incentive to adopt some of the elements of the claims adjustment scheme adopted by the appellee insurers.[2] My position, however, is simply that it is not the job of this court to put the best face possible on the evidence from appellees' point of view. Under the law, on appellees' motion for summary judgment precisely the opposite approach is required. *E. g., United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Under the proper standard, I submit, appellants tendered sufficient evidence to go to the jury.

I respectfully dissent.

---

1. While I do not concede the need to reach the question of the scope of the McCarran-Ferguson Act's boycott exception, I do agree with Part III of the majority opinion insofar as it rejects the narrow view of that exception adopted by the Fifth and Ninth Circuits.

2. I find unpersuasive the majority's suggestion that appellees were not trying to obtain a competitive advantage, but were just trying to keep the price of car repairs, and thus insurance premiums, down. Even though the object is beneficial, insurers may not seek to achieve it by conspiring to tamper with the economics of the car repair industry, or the insurance industry itself for that matter, by boycott. 15 U.S.C. § 1013(b) (1970).